# Staunton

## J. W. McClaugherty v. Phyllis McClaugherty, etc.

September 9, 1942.

Record No. 2475.

Present, Campbell, C. J., and Holt, Hudgins, Gregory and Eggleston, JJ.

The opinion states the case.

*T. Warren Messick, Samuel R. Price* and *Harvey B. Apperson,* for the appellant.

*Walter H. Scott* and *W. Warren Dickerson,* for the appellee.

CAMPBELL, C. J., delivered the opinion of the court.

Phyllis McClaugherty, an infant, who sues by her mother and next friend, instituted this suit to require appellant, J. W. McClaugherty, to make provision for her maintenance and support.

The bill of complaint alleges that appellee is the legitimate daughter of appellant and her mother, Mae E. McClaugherty, and as such is entitled to the relief prayed for.

Appellant filed his answer to the bill of complaint, and while admitting that appellee was his daughter, specifically denied that she was his legitimate daughter, and, therefore, asked that the prayer of the bill for support and maintenance should be denied.

Upon the issue of the legitimacy of appellee, the chancellor was of opinion, and so decreed, that appellee was the legitimate daughter of appellant, and entitled to the support and maintenance for which she prayed. The decree also provided for the payment of counsel fees to the attorneys for appellee.

After the determination of this question, appellant filed a bill of review, and for the first time, sought a dismissal of the suit, on the ground that the court, by reason of the provisions of chapter 80 of the Code, was without jurisdiction to hear and determine the matter.

The basic contention of appellant was that the Juvenile and Domestic Relations Court, established under the provisions of chapter 80 of the Code, had original and exclusive jurisdiction of all actions to compel a parent to provide for the support and maintenance of a minor child. This contention was held to be untenable, and, by decree, the bill of review was dismissed.

The three major questions to be determined are: First, Is Phyllis McClaugherty the legitimate daughter of appellant, J. W. McClaugherty? Second: Was the circuit court without jurisdiction to try the suit? Third: Was the court warranted in allowing counsel fees to the attorneys for appellee?

In an exhaustive opinion, the learned chancellor has so ably and completely answered the first question in the

affirmative that we adopt the same as a part of the opinion of the court. The opinion is as follows:

"This is a suit brought by Phyllis McClaugherty born February 10, 1927, to have herself declared to be the legitimate daughter of her father, J. W. McClaugherty.

"Complainant's mother testifies that she and J. W. McClaugherty, both of whom lived in Roanoke, had been going together regularly from May 13, 1912, and that she had consented to marry him; that on August 5, 1912, she went to Norfolk, and he came down on August 7, 1912; that they both registered at the Lorraine Hotel, but occupied separate rooms; that he came in one day and had a license to get married; that she read the license, but does not recall the Clerk's Office from which it was issued, nor who signed it, that they went a short distance from the hotel to the home of T. A. Taylor, a preacher 65 or 70 years of age, where they were married in the presence of a lady supposed to be the preacher's wife, with a ring ceremony, using the preacher's wife's ring; that they mutually took each other for husband and wife; that the preacher gave them a certificate of marriage; that the next day they went to a cottage at Cape Henry, where they stayed until August 19th, occupying separate rooms; and not registered as man and wife, that while there, they buried the marriage certificate in the sand, because he thought it was better to keep the marriage a secret; that McClaugherty returned to Roanoke on August 19th, and she returned after Labor Day; that when she returned, she went to work for McClaugherty in his store; that McClaugherty told every one that they were married, and she denied it, and her mother thought it best to announce it; that they sent out announcements that they would be at home in October, 1912, and started living together at 608 Second Avenue, N. W.; that in October, 1912, he gave her a wedding ring inscribed: 'J. W. McClaugherty and Mae E. McClaugherty, August 17, 1912,' which she has worn continuously; that she first learned that the marriage was questioned from McClaugherty's brother after he had been sent to a hospital in Baltimore, 1932;

that subsequently, in connection with a divorce she contemplated, and later in connection with other litigation she had two attorneys make investigation in Norfolk, and that neither of them has found there any trace of the minister, nor of the issuance of the license nor of the certificate.

"J. W. McClaugherty denies substantially all of this. He testifies that complainant's mother lived on Second Avenue, N. W., and that he used to meet her just across the street from his store, which was at 533 Second Avenue, N. W.; that she lived with her mother and father, 2 brothers and some other people; that he had known her 12 or 15 months before August, 1912; that he had never discussed marriage with her prior to August, 1912; that he went to Norfolk in July, 1912, where they both stayed at the Lorraine Hotel, and later at the cottage at Cape Henry; that he returned to Roanoke before she did; that she began working for him in his store for which she was paid; that six weeks or two months after she returned from Norfolk, they began living together at 608 Second Avenue, N. W., and that he never discussed marriage with her. The testimony of complainant's mother contains some discrepancies and contradictions. Her story as to the disposition of the marriage certificate is so unusual as of itself to raise a doubt that such a story would be fabricated.

"The testimony of McClaugherty that they began and continued in open, meretricious cohabitation on the same street, and within a few blocks of the home of her parents and brothers, is so unusual as to require more explanation than he has seen fit to give to make it credible.

"McClaugherty testifies that there was no doubt that complainant's mother was regarded in Roanoke City as his wife.

"The evidence is that they worked together in the store, and by their very successful conduct of it, accumulated a large amount of real and other property, some of which was conveyed to her as his wife; that, as his wife, she had very generous accounts with various merchants, charged to him as her husband, and which he paid; that she united, as his wife, in deeds of trust, one securing a note made by him

for $12,000 payable to and endorsed by her, and in deeds of conveyance, one involving as much as $30,000, and another to his father, involving $7,000, this latter deed having been made after the birth of complainant. All of the transactions of this nature during the 20 years they lived together, without exception, were had as husband and wife, and his conduct and representations were such that all parties, merchants, bank and corporation officials, purchasers of real estate and members of his family, dealt with them as husband and wife.

"It is stipulated by his counsel that he claimed, under oath and over his signature, and was allowed, exemption from the draft during the first World War as a married man with dependents; that he claimed, on tax returns signed and sworn to by him, and was allowed deductions on his income tax for the same reason; that between 1913 and 1930 he obtained policies of insurance aggregating $31,000 on applications signed by him stating that complainant's mother was his wife, and naming her beneficiary therein.

"Their first child, a daughter, was born in their home on September 16, 1913. Her birth certificate showed that her parents were married. She was reared and educated by him. Her husband asked and obtained from him, as her father, his consent to their marriage, and he purchased a valuable home for her, which, however, because of the subsequent trouble with her mother, he did not convey to her. Another child was born, died, and was buried in his burial lot; complainant was born in Jefferson Hospital, and her birth certificate shows her parents were married. She was reared and educated by him, was supported by him after her parents had separated, and on two occasions at hearings in this case, he has, in open Court, offered to support and maintain her in the home he now has with his present wife.

"The evidence shows that for twenty years after complainant's mother testified she married defendant, he fulfilled generously all the obligations of a husband and father

to his family; that he enjoyed the full benefits of all the exemptions to which such relationship entitled him; and that on all occasions when his marital status might have been involved, his own conduct, representations and statements, frequently in writing and many of them under oath, show that he was a married man.

"This evidence fully corroborates the testimony of complainant's mother that she and the defendant were married, and completely rebuts any inference in his testimony that their cohabitation was meretricious.

"The testimony of P. C. Wilburn and R. S. Argabright, uncles of complainant by blood and marriage, respectively, as to declaration, conduct, and general and family repute also corroborates her. The record overwhelmingly leads to the conclusion that his present attitude towards complainant is not due to his belief that she is illegitimate, but to his hostility to her mother.

"It would serve no purpose to review the evidence as to what transpired after McClaugherty was sent to the hospital in Baltimore. The differences between him and complainant's mother which grew out of it have been thoroughly aired in this and other courts, and the rights of the complainant are not affected thereby. Complainant was not a party to any of the various litigation between her mother and father, and any inconsistent positions taken by her mother in such litigation cannot operate as an estoppel on complainant. It would only go to the credit of the mother as a witness, and is not sufficient to overcome the evidence which corroborates her.

"In *Newsom* v. *Fleming*, 165 Va. 89, the plaintiff recovered a judgment for $4,000 for criminal conversation with and alienation of the affections of her husband, which was attacked on the ground that no marriage had been proved, because no marriage license had been introduced. The only evidence in the record before the Court of Appeals was her testimony that she had been married to her husband by a certain minister, in Dickenson County where the suit was brought, as a result of which six children were born and

that she and her husband lived together until he became criminally intimate with the defendant, and a statement in the Bill of Exceptions that other witnesses, without objections, spoke of them as husband and wife.

"Chief Justice Campbell, speaking for the court, in affirming the judgment, states, at page 96, that in making such contention counsel for defendant seemed to have confused proof of marriage and validity of marriage. He continues, 'In *Eldred* v. *Eldred*, 97 Va. 606, 34 S. E. 477, Judge Cardwell held that in Virginia marriage may be proved by reputation, declaration and conduct of the parties. That case was followed by *Reynolds* v. *Adams*, 125 Va. 295, 99 S. E. 695, and *Vanderpool* v. *Ryan*, 137 Va. 445, 119 S. E. 65. In both cases it was held that in the interest of morality and decency the law presumed marriage between a man and woman when they lived together as man and wife, demeaning themselves towards each other as such, and that status in society is recognized by their friends and relatives. While it is true, however, that cohabitation and repute do not constitute marriage, they do constitute strong evidence tending to raise a presumption of marriage, and the burden is on him who denies the marriage to offer countervailing evidence.'

"In the case at bar the evidence is conclusive that complainant's parents lived together as man and wife, demeaning themselves together as such, and such status was recognized by their friends, relatives, and all other persons who had any dealings with them. The marriage is denied by the defendant. He relies on his testimony and is entitled to avail himself of the hearsay testimony of complainant's mother as to the result of the investigations made in Norfolk. None of the attorneys or other persons who made the investigations testified, and there is no evidence of what they did. Neither of complainant's parents lived in Norfolk. There were some 120 other clerk's offices in Virginia from which a marriage license could have been issued with as much validity as one issued by a clerk in Norfolk, and as many courts in which a minister could qualify to

perform marriages anywhere in the State. In the absence of testimony that the license was issued in Norfolk, and of the nature and extent of the investigation made 25 years after the marriage took place, the failure to find evidence of it there, or to find a minister who was 65 or 70 years old at the time of the marriage, and the bold denial of the marriage by the defendant are not sufficient to overcome the presumption of marriage supported as it is in this case. See *Reynolds* v. *Adams*, 125 Va. 295, wherein it was held that the testimony of the clerk in the city in another State, where the marriage was alleged to have taken place, that his was the only office from which license to marry could be obtained, and that his marriage record did not show that a marriage license was issued from his office for such marriage, but did not undertake to say that there was no other officer who could have issued the license at the time the marriage occurred, did not furnish that most cogent and satisfactory evidence which is requisite to repel the presumption of marriage arising from cohabitation, apparently matrimonial.

"The testimony of complainant's mother, corroborated as it is by such conclusive evidence of the matrimonial reputation, declarations and conduct of her parents, the presumption arising therefrom and the inconclusiveness of the countervailing evidence, prove, on the issues involved in this case, that complainant is the legitimate child of J. W. McClaugherty.

"She relies, however, on the proof as showing that she is the issue of common law marriage, legitimate by reason of section 5270 of the Code.

"The provisions of sections 5269 and 5270 of the Code (2553 and 2554, respectively of the Code of 1887) were first enacted in 1775 as parts of the same clause. They will be referred to by their section numbers in the present Code of Virginia. West Virginia has identical statutes. The Courts of both States have generally considered section 5270 with section 5269 in ascertaining the intention of the Legislature in enacting them, and section 5270 with section 5071

in ascertaining the intention of the Legislature in enacting section 5071.

"The leading case is *Stones* v. *Keeling*, 5 Call 143, decided in 1804, hereinafter referred to, which holds that section 5270 should be liberally construed, and that children of a bigamous marriage are legitimate under section 5270. In this case Judge Roane says that it was not the temper of the Legislature to visit the sins of a criminal marriage upon the innocent and unoffending offspring. 'It is important also that this provision' (5269) 'immediately precedes the sentence in question' (5270) 'which is part of the same clause, and connected therewith by the word "also." If the Legislature has legalized children begotten in open fornication where there is no marriage, or semblance of marriage, it is a reasonable presumption that they at the same moment, and by the same clause, meant also to include the offspring of marriages, which, though void in law, and unfortunate, may be nevertheless excusable and even innocent.'

" 'In the case of *Beverlin* v. *Beverlin*, 29 W. Va. 732, 3 S. E. 36, which holds that common law marriages, when contracted in this State, are not recognized by our court as valid, Judge Snyder, who wrote the opinion expressly says that he came to that conclusion with less regret because, by the express command of our statute, "the issue of marriages deemed null in law, or dissolved by a court, shall nevertheless be legitimate." In that case the controversy was between husband and wife, she having sued him for a divorce and alimony. That relief was denied her, because the common law marriage shown to exist in the case was not deemed valid; the rights of the issue of that marriage were not involved, and the learned Judge says that he came to that conclusion with less regret because the statute above quoted, made the children legitimate.' This quotation is from *Kester* v. *Kester*, post.

"In *Eldred* v. *Eldred*, 97 Va. 606, at page 630, Judge Cardwell, speaking for the court, says, 'So solicitous for the welfare of the innocent offspring of an illicit cohabitation

has the lawmaking power of our State been, that it is declared that' quotes the provisions of section 2553, 'and by section 2554, it is declared that the issue of marriages deemed null in law, shall nevertheless be legitimate.' But unfortunately, these statutes have no application to this case.

"In *Offield* v. *Davis*, 100 Va. 250, at page 255, Judge Cardwell again speaking for the court, cites *Beverlin* v. *Beverlin, supra,* and refers to the opinion therein as an opinion of Snyder, J., an able and learned jurist, concurred in by the entire court. At page 263, referring to common law marriages, he says: 'If such a marriage in this State could be held valid, it would seem to have been a useless effort on the part of our legislature, by certain acts passed, to protect innocent offspring of an illicit cohabitation. Secs. 2553, 2554, of the Code.'

"In *Goodman* v. *Goodman*, 150 Va. 42, holding that children previously born were made legitimate by a bigamous marriage, the opinion of Judge West, construing sections 5269, 5270 and 5287, states at page 45, 'These statutes are remedial in their nature and should be liberally construed. When so construed, it is apparent that the object and purpose of their enactment was to remove the stain and disability of bastardly from all "innocent and unoffending" children who, for any cause, might be classed as illegitimate.'

"The courts of West Virginia uniformly approve the rule that its statute, being a humanitarian statute, shall be liberally construed, so as to embrace a common law marriage contracted in that State; but such construction does not dispense with the proof of such marriage, or take from the persons asserting it the burden of such proof.

"*Pickens* v. *O'Hara*, 200 S. E.—5th syllabus by the court.
"*Kester* v. *Kester*, 146 S. E. 625 at page 627.
"*Fout* v. *Hanlin*, 169 S. E. 743, at page 745.
"*Luther* v. *Luther*, 195 S. E. 594, at page 595.
"In *Kester* v. *Kester*, the opinion by Judge Lively cites *Beverlin* v. *Beverlin* as quoted above. He also cites *Stones* v. *Keeling* and quotes extensively from the opinions of

Judges Tucker and Roane, and adopts the reasons given by them for holding that these statutes should be liberally construed and that the Legislature did not intend to visit the sins of the parents upon the innocent and unoffending offspring, even of incestuous marriages contracted in defiance of laws human and divine. He states, '*Stones* v. *Keeling, supra*, has been consistently followed by the courts of Virginia, and is binding upon this court. In other jurisdictions, where similar statutes have been passed, the rule of construction given by the Virginia courts has been uniformly followed,' citing 7 C. J. 948, L. R. A. 1916 C, page 764, and cases from California and Arkansas. 'It being clear in this case that there was at least a common law marriage, not recognized by our courts as valid, and deemed null in law, the statute above quoted relieves these children of their status as bastards, and makes them legitimate.'

"In *Fout* v. *Hanlin, supra*, Judge Maxwell says, page 744, the legitimatizing statute founded in benevolence and charity has for its design the protection of innocent offspring. Humanitarian principles require that the statute be liberally construed to effectuate its benign purpose.

■ "These decisions of the Supreme Court of Appeals of West Virginia, and *dicta* of the distinguished judges of our own Supreme Court of Appeals, concurred in by the entire court, are each entitled to much respect. They concur in construing section 5270 to legitimatize the issue of common law marriages. This construction is supported by sound reasoning from the Virginia decision. There is no Virginia authority to the contrary.

"To deny the protection of this section to the innocent and unoffending offspring of common law marriages, requires the most narrow and technical construction of the phrase 'marriage deemed null in law,' defeats the intention of the Legislature as determined by our Virginia court, and violates the principle of liberal construction laid down by them.

"I am, therefore, of the opinion that complainant is the

legitimate daughter of the defendant, and as such is now entitled to reasonable support and maintenance from him, the amount of which will be determined at a subsequent hearing."

In our opinion, there is no merit in the contention that the court was without jurisdiction to hear and determine the case.

In Virginia, the rule prevails, even in the absence of statute, that it is the common-law duty of a father to support his infant child. Nowhere has the rule been more succinctly stated than in Minor's Institutes, Volume 1, page 405:

"The wants and weakness of childhood render maintenance by some one other than the child himself indispensable, and the voice of nature indicates the parent, that is the father, as the fittest person to afford it. The duty of maintenance on the part of fathers in respect to their *infant* children is, therefore, a principle of *natural law,* the right to which, on the part of such children, is insisted upon as a *perfect right* by the most eminent authorities, as, amongst others, by Puffendorf and Montesquieu. * * *

"The municipal laws of all well regulated societies take care to enforce this duty; though Providence has done it more effectively by implanting in the heart of every parent that unquenchable affection which not even the deformity of person and mind, nor the wickedness, ingratitude, and rebellion of children can totally extinguish."

In *Mihalcoe* v. *Holub*, 130 Va. 425, 107 S. E. 704, in an opinion by Kelly, President, it was held that a father owes his infant child the duty of maintenance: "This by the weight of American authorities, founded upon common sense and natural justice, is a legal and not merely a moral obligation."

In *Buchanan* v. *Buchanan*, 170 Va. 458, 472, 197 S. E. 426, 116 A. L. R. 688, this doctrine was re-affirmed in an opinion by Mr. Justice Hudgins.

Since it is an inherent right of an infant to demand that he be supported by his father, then it follows that there

must be some tribunal to which he can resort to enforce such a right.

In *Butler* v. *Commonwealth*, 132 Va. 609, 614, 110 S. E. 868, 23 A. L. R. 861, it is held that neither a wife nor a wife's father "could charge the defendant (father) in a civil suit for the support and maintenance of the children."

Hence, where does the remedy exist?

"In every well regulated government there must somewhere exist a power of affording a remedy where the law affords none, and this peculiarly belongs to a court of equity." *Purcell* v. *Purcell*, 4 Hen. & M. (14 Va.) 507.

Infants have ever been regarded as the wards of a court of equity and where the natural guardian of an infant is derelict in the performance of his legal and moral duty to support his infant child, then a court of equity will intervene in order that such relief may be afforded as the exigencies of the case demand.

In *Heflin* v. *Heflin*, 177 Va. 385, 14 S. E. (2d) 317, the question for determination was: "Has a court of equity ever had inherent jurisdiction to entertain a suit for separate maintenance of a deserted wife where no divorce is sought?"

In that case, it was contended that the Juvenile and Domestic Relations Court, under the provisions of sections 1936 and 1937 of the Code, had exclusive jurisdiction, and hence, resort for relief must be had in that court. This contention was sustained by the lower court, and the bill of complaint, by decree entered, was dismissed. Upon appeal, this court reversed the decree of the trial court. In an exhaustive opinion, Mr. Justice Gregory fully covered the question relative to the inherent power of a court of equity to grant relief when a court of law was powerless to grant such relief as the exigencies of the case demanded.

In discussing the contention that the language in section 1937 of the Code conferred upon the Juvenile and Domestic Relations Court exclusive original jurisdiction of the question in issue, Mr. Justice Gregory had this to say:

"Under the desertion and non-support statutes the wife is compelled to have her husband adjudged guilty of a crime

and must be destitute and in necessitous circumstances before she can receive the meager wages he earns for work on the road force. This crime must be proven as all other crimes—the guilt of the husband must be shown beyond all reasonable doubt. If he is found guilty he may appeal, but no provision is made for the deserted wife's appeal if he is not found guilty.

"These statutes do not, in terms or otherwise, wipe out the other remedies of a deserted wife. They do not purport to embrace all other remedies for support which may arise, such as those under the divorce statutes and those brought under the inherent jurisdiction of an equity court for separate maintenance alone. The statutes embrace only those cases 'arising under this act,' which means cases in which deserted wives wish to prosecute their husbands criminally and as an incident, if found guilty, to receive their wages if they are physically able to work on the roads. It is an effective means to require them to perform their legal duty.

"The statutes provide an additional and quick remedy, in cases arising under it, to punish the guilty husband for his offense and at the same time prevent the wife from becoming a public charge. They give no civil remedy."

What is said there in regard to a deserted wife is most apposite when applied to the case at bar. The principle involved is the same. Neither in law nor in morals, should a distinction be drawn between the right appertaining to a deserted wife and the right appertaining to a neglected child.

The statutes relied upon by appellant afford no material aid to the appellee. The fact that she could prosecute her father, and the judge of the juvenile court could send him to jail, does not satisfy the pangs of hunger or protect the body from the cold of winter. Even though the judge should take cognizance of the matter, and should, under the terms of the statute, impose a fine of five hundred dollars upon the appellant, there is no adequate provision in the statute for enforcing the penalty, so far as the appellee is concerned.

That courts of law and courts of equity may have concurrent jurisdiction is settled by the decisions of this court.

In *Buchanan* v. *Buchanan*, 174 Va. 255, 6 S. E. (2d) 612, Mr. Justice Holt stated the applicable rule as follows:

"Equity has jurisdiction in cases of recognized rights, when a plain, adequate and complete remedy cannot be had in the courts of common law. The remedy must be plain; for if it be doubtful and obscure at law, equity will assert a jurisdiction. It must be adequate, for if at law it falls short of what a party is entitled to, that founds a jurisdiction in equity. And it must be complete; that is, it must attain the full end and justice of the case. It must reach the whole mischief, and secure the whole right of the party in a perfect manner, at the present time and in the future, otherwise equity will interfere and give such relief and aid as the particular case may require. The jurisdiction of a court of equity is therefore sometimes concurrent with the jurisdiction of a court of law; it is sometimes exclusive of it, and it is sometimes auxiliary to it." *Feckheimer* v. *National Exch. Bank*, 79 Va. 80.

"A remedy cannot be said to be fully adequate to meet the justice and necessities of a case unless it reaches the end intended, and actually compels a performance of the duty in question. Such other remedy, in order to constitute a bar to *mandamus*, must be adequate to place the injured party, as nearly as the circumstances of the case will permit, in the position which he occupied before the injury or omission complained of.

"The controlling question is not 'Has the party a remedy,' but is that remedy fully commensurate with the necessities and rights of the party under all circumstances of the particular case?" *Richmond Ry., etc., Co.* v. *Brown*, 97 Va. 26, 32 S. E. 775, quoted with approval in *Sinclair* v. *Young*, 100 Va. 284, 40 S. E. 907.

While we re-affirm the principle enunciated by Mr. Justice Hudgins in *Buchanan* v. *Buchanan*, *supra*, 170 Va. 458, 472, 197 S. E. 426, 116 A. L. R. 688, that, "Actions or suits, by or in behalf of a child against its parent, should not be encouraged," under the conditions appearing in that case,

we are firmly of opinion that when it is made to appear, as it does appear in this case, that the child is in necessitous circumstances, then the strong arm of chancery will stretch forth to save and protect her.

The concluding contention of appellant, that the court erred in awarding counsel fees, is without merit.

The record discloses that appellant is a man of considerable means, and hence in a position to amply pay counsel for his daughter, for the very efficient service they have rendered her.

There is no error in the decrees of the trial court and it is accordingly affirmed.

*Affirmed.*

HUDGINS, J., concurs in result.