MAE HOLLAND MURPHY

V.

RALEIGH PARIS HOLLAND, JR.

Record No. 860660

March 3, 1989

Present: All the Justices

*W. R. Broaddus, III; Susan N. Deatherage (Broaddus, Epperly & Hanks*, on brief), for appellant.

*J. Grady Monday (Monday & Monday*, on brief), for appellee.

CARRICO, C.J., delivered the opinion of the Court.

In the court below, Raleigh Paris Holland, Jr. (Paris), filed a bill of complaint seeking to have himself declared "the legitimate and sole heir" of Raleigh Paris Holland (Holland), who died intestate owning a 77.25-acre tract of land in Henry County. Mae Holland Murphy (Murphy), Holland's sister, was named defendant, and she filed an answer in which she claimed ownership of the land. Murphy also filed a plea of laches.

After an ore tenus hearing, the trial court overruled Murphy's plea of laches and held that Paris was Holland's legitimate son, entitled to inherit his father's entire estate. We granted Murphy an appeal.

Then single and living with his parents, Holland purchased the 77.25-acre tract, consisting of unimproved farm land, in 1955. On August 29, 1961, Paris was born of a union between Holland and

Geneva Craddock (Geneva). Holland signed Paris's birth certificate as "Father" and thereafter treated the child as his own. Another child, Kennon, was born of the union between Holland and Geneva.

Holland and Geneva never went through a marriage ceremony. They were living together as husband and wife, however, at the time of Paris's birth and continued to hold themselves out as a married couple until Holland's death on September 28, 1968, when Paris was seven years old. Geneva was known by and used her husband's surname, and the two were considered a married couple by family members and others.

Following Holland's death intestate, his mother, Effie Holland, qualified as his administratrix and listed herself and Holland's father as Holland's only heirs. Holland's parents claimed the land by intestate succession from Holland. After the father's death in 1969 and the mother's in 1977, Holland's sister, the appellant, claimed the property by descent from her parents.

Meanwhile, on January 16, 1969, when Paris was seven years five months old, Geneva, as mother and next friend, filed a bill in chancery on behalf of Paris and his younger brother, Kennon, against Effie Holland, individually and as administratrix of Holland's estate. Holland's father was also named a party defendant. The bill prayed that the two brothers be declared Holland's "legitimate heirs." The matter reached the point where demurrers had been overruled and an answer filed, but the suit was dismissed on December 20, 1972, because "no action [had] been taken . . . since April 14, 1969."

By deed dated May 10, 1983, Kennon Holland quitclaimed to Paris all his right, title, and interest in and to the 77.25-acre tract. Then, on August 29, 1983, Paris filed a memorandum of lis pendens, purportedly giving notice of a "pending" suit affecting Murphy's interest in the 77.25-acre tract. No suit was pending, however, at that time.

The present suit was filed December 21, 1984. Paris testified below he did not discover until mid-1983, when he was twenty-one years old, that his father had owned the 77.25-acre tract and that his mother and father had never been formally married.

■ We first consider whether the trial court erred in overruling Murphy's plea of laches. Concerning such a plea, we said in *Morris* v. *Mosby*, 227 Va. 517, 317 S.E.2d 493 (1984):

When a trial court considers the defense of laches, it does not apply an absolute rule such as a statute of limitations, but instead, the court examines each case in light of the particular circumstances. Therefore, whether under the circumstances of a given case a claim is barred by laches is primarily a decision resting within the discretion of the trial court. Absent an abuse of discretion, its decision will not be disturbed on appeal.

*Id.* at 521, 317 S.E.2d at 496 (citations omitted). And in *Hamilton v. Newbold*, 154 Va. 345, 153 S.E. 681 (1930), we said:

[L]aches or delay, in order to be effectual as a bar to the party [against whose claim the defense of laches is asserted], must be accompanied with circumstances and facts showing an intention on his part to abandon the [claim]. [The delay] must be unreasonable and injurious to the other party.

*Id.* at 351, 153 S.E. at 682.

It is difficult to discern from Murphy's brief what event she thinks started the time running on Paris's claim. At one point, Murphy seems to contend that the time began to run from the date in 1969 when Paris's mother filed suit on his behalf to have him legitimized. Murphy says that the fifteen years between 1969 and 1984, when the present suit was brought, is a "long . . . time to put off filing a claim."

At another point, Murphy appears to take the position that the time began to run when Paris reached his eighteenth birthday in 1979 and that he should have filed suit immediately thereafter. Murphy says that because Geneva, as Paris's next friend in the 1969 suit, knew of Murphy's claim to the 77.25-acre tract, Paris "certainly was responsible for obtaining this information by the time he became 18 years of age." Under these circumstances, Murphy maintains, the five-and-one-half-year delay in filing suit after Paris became eighteen "is inexcusable."

At yet another point, Murphy argues that, at the latest, Paris became aware of his rights in May 1983, when he secured the quit-claim deed from Kennon. Even then, Murphy says, "laches would apply," for to withhold filing suit from May 1983 until December 1984, another year and eight months, "showed a lack of diligence" on Paris's part.

Murphy argues that these periods of delay, amounting to fifteen years, five and one-half years, and one year eight months, respectively, prejudiced her defense. By the time the present suit was filed, Murphy says, her parents had died, and they "knew more about the actions of their son, Raleigh Paris Holland, [Sr.,] than anyone else."

We reject as without merit Murphy's contention that laches began to run against Paris's claim from the time the suit was filed in 1969, when he was only seven years old. At the earliest, time began to run against the claim when Paris became eighteen and, even then, he had a reasonable time within which to bring the claim. What is reasonable depends upon the circumstances of each case, and one of the circumstances to be considered is the injury or prejudice the delay in bringing suit causes the opposing party. *Hamilton*, 154 Va. at 351, 153 S.E. at 682.

As noted previously, Murphy points to the death of her parents and the resulting loss of their testimony as the prejudice she suffered from Paris's delay in bringing suit. But Murphy's parents had already died, the father in 1969 and the mother in 1977, before Paris ever reached his eighteenth birthday or discovered his father's ownership of the 77.25-acre tract. Accordingly, Paris cannot be charged with this loss of testimony.

Furthermore, the trial court specifically found that "[n]o evidence was lost or subject to conjecture by the death of anyone, lapse of time or otherwise" and that "there was ample and clear testimony by witnesses who personally knew all the parties involved and the facts of this case." The trial judge concluded that since "the evidence available and . . . presented does in fact allow the Court to make a full and fair ascertainment of the facts," the "doctrine of laches does not apply." *See Shirley* v. *Van Every*, 159 Va. 762, 775, 167 S.E. 345, 349-50 (1933).

We find from this record no evidence that Paris intended "to abandon the [claim]" or that the delay involved was "unreasonable and injurious to the other party." *Hamilton*, 154 Va. at 351, 153 S.E. at 682. Accordingly, we hold that the trial court did not abuse its discretion in overruling Murphy's plea of laches.

This brings us to the question whether the court erred in declaring Paris legitimate and entitled to the land in question. Paris contends that his parents' relationship was not merely meretricious. Rather, he argues, they entered into a common law marriage,

holding themselves out as husband and wife before and after Paris's birth and until Holland's death in 1968.

■ Paris correctly concedes that Virginia does not recognize common law marriages contracted in this State.[1] *Offield* v. *Davis*, 100 Va. 250, 263, 40 S.E. 910, 914 (1902). Indeed, Paris states that "in Virginia such marriages are simply '*void*,' " but, he says, this is what legitimizes him. A common law marriage may not be valid as between the immediate parties, Paris opines, yet it qualifies as a marriage "null in law" within the meaning of Code § 64-7, and, hence, entitles him to the declaration of legitimacy he received at the hands of the trial court.

Code § 64-7 is the focus of the controversy. At the time of Holland's death on September 28, 1968, the section provided that "[t]he issue of marriages deemed null in law . . . shall nevertheless be legitimate."[2]

Murphy contends that a ceremonial marriage is required for Code § 64-7 to become operative. Since Holland and Geneva never participated in a ceremony, Murphy opines, their relationship did not provide a sufficient basis for declaring Paris legitimate.

In support of her contention, Murphy quotes from *Vanderpool* v. *Ryan*, 137 Va. 445, 450, 119 S.E. 65, 66 (1923), that "it is essential, in order to legitimize issue under [Code § 64-7], that there be a marriage of some kind or the statute can have no application."

*Vanderpool* involved a claim by a mother that she and the putative father had gone through a marriage ceremony. This Court affirmed a judgment denying legitimacy because it found "incredible" the mother's claim that a ceremonial marriage had taken place. *Id.* at 449, 119 S.E. at 66. The Court did not hold that a common law marriage cannot support a finding of legitimacy. Rather, the Court stated that "[t]he facts shown in this case are insufficient to prove even a common law marriage, but clearly indicate a meretricious union." *Id.*

---

[1] A common law marriage is "[o]ne not solemnized in the ordinary way (*i.e.* non-ceremonial) but created by an agreement to marry, followed by cohabitation." *Black's Law Dictionary* 251 (5th ed. 1979).

[2] Code § 64-7 became § 64.1-7. The latter section was repealed by Acts 1978, ch. 647, and, with changes in wording, now appears as the second paragraph of Code § 20-31.1.

Paris cites *McClaugherty* v. *McClaugherty*, 180 Va. 51, 21 S.E.2d 761 (1942). There, in a suit by a child to have herself declared legitimate, the mother testified that she and the putative father were married with license in a ceremony conducted by a preacher. According to the mother, the parties sent out wedding announcements and lived together openly as man and wife for twenty years after the marriage ceremony. The husband denied that the parties had gone through a marriage ceremony or had ever discussed the subject of marriage. He did acknowledge that the parties had lived together for twenty years and that the mother was regarded in the community as his wife. He also treated the child as his own.

In a lengthy written opinion, the trial court reviewed the evidence concerning the alleged marriage ceremony and the history of the parents' life together. The trial court then wrote:

'The testimony of complainant's mother, corroborated as it is by such conclusive evidence of the matrimonial reputation, declarations and conduct of her parents, the presumption arising therefrom and the inconclusiveness of the countervailing evidence, prove, on the issues involved in this case, that complainant is . . . legitimate. . . . '

*McClaugherty*, 180 Va. at 61, 21 S.E.2d at 765. This holding, of course, would have been sufficient to establish the child's legitimacy. But in the very next paragraph of its opinion, the trial court stated that " '[s]he relies, however, on the proof as showing that she is the issue of common law marriage, legitimate by reason of section 5270 [later § 64-7] of the Code.' " *Id.*

The trial court then proceeded to discuss the question whether the child of a common law marriage was legitimate under Code § 5270, later Code § 64-7. The trial court reviewed the authorities on the subject, including cases from this Court and the Supreme Court of Appeals of West Virginia, which had an identical statute. The trial court then concluded:

'These decisions of the Supreme Court of Appeals of West Virginia, and *dicta* of the distinguished judges of our own Supreme Court of Appeals [in *Stones* v. *Keeling*, 9 Va. (5 Call) 143 (1804)], concurred in by the entire court, are each entitled to much respect. *They concur in construing section 5270 [later Code § 64-7] to legitimatize the issue of com-*

*mon law marriages.* This construction is supported by sound reasoning from the Virginia decision. There is no Virginia authority to the contrary.

'To deny the protection of this section to the innocent and unoffending offspring of common law marriages, requires the most narrow and technical construction of the phrase "marriage deemed null in law," defeats the intention of the Legislature as determined by our Virginia court, and violates the principle of liberal construction laid down by them.'

*McClaugherty,* 180 Va. at 64, 21 S.E.2d at 766 (emphasis added).

We have quoted from the trial court's opinion in *McClaugherty* because this Court adopted the opinion as its own. *Id.,* 180 Va. at 56, 21 S.E.2d at 762. Hence, this Court approved the trial court's holding that the forerunner of Code § 64-7 legitimized issue of common law marriages.

The United States Court of Appeals for the Fourth Circuit followed *McClaugherty* in deciding *Grove* v. *Metropolitan Life Insurance Company,* 271 F.2d 918 (1959), a case involving the application of Virginia law. The Court stated that in *McClaugherty,* "[t]he statute legitimizing the children of marriages 'null in law' was held effective to legitimize the child of a common law marriage." *Grove,* 271 F.2d at 921.[3]

Murphy argues that both *McClaugherty* and *Grove* were decided incorrectly. Murphy says: "Every lawyer that attended a Virginia law school knows that 'Virginia does not recognize a common law marriage.'" This is true. It is also true, however, that Virginia does not recognize bigamous marriages. Yet, the antecedent of Code § 64-7 has been held to legitimize issue of bigamous marriages. *Stones* v. *Keeling,* 9 Va. (5 Call) 143 (1804). This is because "the object and purpose of [the] enactment [of Code § 64-7 and similar statutes] was to remove the stain and disabilities of bastardy from all 'innocent and unoffending' children who for any cause might be classed as illegitimate." *Goodman* v. *Goodman,* 150 Va. 42, 45, 142 S.E. 412, 413 (1928). The

---

[3] *McClaugherty* was also followed in *Kasey* v. *Richardson,* 331 F.Supp. 580 (W.D.Va. 1971), aff'd, 462 F.2d 757 (4th Cir. 1972), and *Milton* v. *Escue,* 201 Md. 190, 93 A.2d 258 (1952). Both these cases involved the application of Virginia law and both cited *McClaugherty* in determining that issue of common law marriages are legitimate in Virginia. 331 F.Supp at 584; 201 Md. at 197-98, 93 A.2d at 261-62.

same reason applies with equal force to the issue of common law marriages.

Murphy also argues that the *McClaugherty* case incorrectly equated common law marriages with ceremonial marriages. We disagree. What the trial court did in that case was to make alternative holdings, and this Court affirmed both. In the first holding, the trial court found the child legitimate on the basis of the ceremonial nature of the parents' relationship. In the second, the trial court found the child legitimate on the basis that, assuming the absence of a ceremony, the parents' relationship constituted a common law marriage. Nothing in the section of the trial court's opinion relating to common law marriages suggests the court thought a ceremony was a necessary incident of such marriages, and this Court certainly knew that the requirement of a ceremony would be antithetical to the concept of a common law marriage as a contractual relationship. *See Black's Law Dictionary* 251 (5th ed. 1979).

█ While common law marriages are not recognized in Virginia, they are marriages "null in law" under Code § 64-7. Hence, the trial court did not err in finding Paris legitimate within the meaning of that section's terms.

For the reasons assigned, the judgment of the trial court will be affirmed.

*Affirmed.*