CENTRAL BENEFITS MUTUAL INSUR-
ANCE COMPANY and Central Benefits
National Life Insurance Company,
Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD
ASSOCIATION, Defendant.

No. C–2–88–508.

United States District Court,
S.D. Ohio, E.D.

March 22, 1989.

David J. Young, Steven W. Tigges, James S. Savage, and Squire, Sanders & Dempsey, Columbus, Ohio, for plaintiffs.

James E. Pohlman and Porter, Wright, Morris & Arthur, Columbus, Ohio, and William R. Jentes, James M. Amend, Jack A. Rovner, Alexander F. MacKinnon, and Kirkland & Ellis, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GRAHAM, District Judge.

Plaintiffs Central Benefits Mutual Insurance Company ("CBMIC") and Central Benefits National Life Insurance Company ("CBNLIC") filed this action on May 6, 1988 against defendant Blue Cross and Blue Shield Association ("Association"), raising various federal and state antitrust claims. On June 22, 1988, the Association filed an answer and counterclaim against CBMIC, CBNLIC, and Mid–Ohio Healthcare Plan, Inc., d/b/a Health One. The Association's counterclaim alleged breach of the service mark licensing agreements between the Association and CBMIC, service mark infringement in violation of § 32(1) of the Lanham Trade–Mark Act, as amended, 15 U.S.C. § 1114(1), and false designation of origin and false description or representation in violation of § 43(a) of the Lanham Trade–Mark 15 U.S.C. § 1125(a).

This matter is presently before the Court on the motion for preliminary injunction filed by the Association on November 21, 1988. The Association is seeking preliminary, injunctive relief solely against defendant CBNLIC on the grounds of service mark infringement and false designation of origin and false description or representation. This matter came on for hearing February 13–16, 1989 and is now ripe for decision.

## FINDINGS OF FACT

The Blue Cross and Blue Shield Association is a not-for-profit corporation organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois. The Association has its roots in local, community based health insurance plans formed approximately fifty years ago. The plans which offered hospitalization coverage developed the Blue Cross name and service marks. The separate and independent plans which offered medical and surgical coverage developed the Blue Shield name and service marks. These plans were typically sponsored by local hospital associations, medical societies, labor unions, business groups, and churches.

In 1952 all of the Blue Shield plans assigned their rights in the Blue Shield name and marks to the Blue Shield Medical Care Plans, a/k/a the Blue Shield Association. The Blue Shield Association in turn licensed the member plans to use the name and marks. The plans traditionally operated within their own exclusive geographic areas.

In 1972 all of the Blue Cross plans assigned their rights in the Blue Cross name and marks to the Blue Cross Association. The Blue Cross Association in turn licensed the member plans to use the name and marks. These plans also traditionally operated within their own exclusive geographic areas. Blue Cross of Central Ohio, predecessor of CBMIC, was one of the plans that assigned its rights to the name and marks to the Blue Cross Association and received a license in return.

In 1982 the Blue Cross Association and the Blue Shield Association merged to form the Blue Cross and Blue Shield Association. All the license agreements and ownership rights in the Blue Cross and Blue Shield names and marks were assigned to the Blue Cross and Blue Shield Association. The members of the Association are seventy-five separate and autonomous health insurance companies located throughout the United States. Most member plans now possess both Blue Cross and Blue Shield licenses and offer a full range of coverage including hospitalization, medical, surgical, dental, and other health care benefits.

The Association is owned and controlled by the member plans. In fact, by majority

vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans. CBMIC is a member plan of the Association.

The purposes of the Association, as stated in its Articles of Incorporation, include promotion of the public health and safety, protection of the Blue Cross and Blue Shield names and marks, and the development and maintenance of membership standards. Regular membership in the Association is restricted to Blue Cross Plans, Blue Shield Plans, and Blue Cross and Blue Shield Plans. Art. II, § 1 of Bylaws. The Association is funded in part by monthly dues assessed against its members. Art. II, §§ 1, 2 of Bylaws. The Association is governed by a board of directors, two-thirds of which must be composed of chief executive officers of member plans. The remaining one-third is composed of either plan chief executive officers or plan board members. The Association itself is not a health insurance company nor does it provide health insurance products and services. Its primary function is as owner and licensor of the Blue Cross and Blue Shield names and marks. In that capacity, the Association monitors compliance with the licensing agreements and policies any service name or service mark infringement. The Association currently owns twenty-three valid service mark registrations with the United States Patent and Trademark Office.

The Association also provides support services for its member plans. First, the Inter–Plan Service Benefit Bank serves as a clearing house for the transfer of funds between the plans. Second, the Association supplies a private telecommunication system which provides computer access for and links all the plans. Third, the Association contracts with the federal government to provide health insurance for federal employees. Since the Association is not an insurance company itself, it subcontracts with member plans to provide health care coverage for the federal employees within each plan's service area. Fourth, the Association contracts with the United States Department of Health and Human Services to deliver Part A of the Medicare program, which it likewise subcontracts with its member plans. Finally, the Association provides national networks on behalf of its member plans for various new health care products. The networks serve as national marketing vehicles for the member plans. These networks include HMO USA, Preferred Care USA, and Custom Care USA.

The health care insurance traditionally offered by Blue Cross and Blue Shield member plans has three basic distinctive features. First, the insurance is a prepaid service benefit program. Each member plan contracts with hospitals, physicians, and other health care providers within its geographic area. The advantage of this arrangement is that the health care providers file their claims directly with the plan, thus obviating the subscribers' filing of claims. The claims are paid directly by the member plan to the health care provider. The plans negotiate prices for various services with the providers. This differs from indemnity programs which require the subscriber to pay the health care provider and then seek indemnity from his insurance company. Second, the coverage is portable. A subscriber of one plan can travel anywhere in the United States and process a claim through any other plan. That plan will then be reimbursed through the Inter–Plan Bank by the originating plan. In addition, a subscriber who changes residence can automatically transfer his coverage to the member plan in his new locale with a minimum of paperwork and delay. Finally, the member plans are community based not-for-profit plans. Traditionally each plan had its own exclusive service area, although this is no longer true in Ohio. *See infra.* The plans are based in specific geographic areas, some operating statewide. None operate outside the state in which it is licensed.

Member plans must originally apply for licenses to use the Blue Cross and/or Blue Shield names and marks, and then renew their memberships annually. In order to gain and maintain eligibility to be a member plan, an applicant must meet ten membership standards. A prospective member

must be in substantial compliance with the membership standards at the time membership is granted and during the two years preceding the application. The first standard is that the plan must be organized as a not-for-profit entity. Second, the plan's activities must be directed principally to health care financing and delivery. Third, the plan must maintain a governing board of a majority of persons other than providers of health care services. Fourth, the plan must grant the Association the right to examine its affairs. Fifth, the plan must furnish in a timely and accurate manner all reports and records as required by the Association's board. Seventh, the plan must agree to submit all matters to board-established mediation before instituting legal action against another plan or the Association. Eighth, the plan must operate in a manner responsive to marketplace demand, which is measured in reference to enrollment and service levels, and reporting performance. Ninth, the plan must maintain adequate financial resources to protect the interests of its subscribers. Finally, the plan must participate effectively and efficiently in each national program adopted by the member plans. Standards One through Seven are mandatory whereas noncompliance with Standards Eight through Ten can result in conditional membership status or nonrenewal of membership.

Upon the conferment of membership, the new member plan is granted a license to use the Blue Cross and/or Blue Shield names and marks. The Blue Cross license agreement allows the plan "to use the Licensed Marks as service marks, in the sale and advertising of programs for health care and related services operated on a non-profit basis in a manner approved by [the Association] in regulations of general application to prevent the impairment of the distinctiveness of the Licensed Marks and Licensed Name and the good will pertaining thereto." The Licensed Name can also be used as a trade name by the plan and can be used in the plan's corporate name. Further, the license agreements provide that "[t]he rights hereby granted are exclusive to Plan within the geographi-

cal area served by the Plan on the effective date of this License Agreement." The Association in turn "agrees that it will not grant any other license effective during the term of this License Agreement for use of the Licensed Marks or Licensed Name which is inconsistent with the rights granted to Plan hereunder." "The license hereby granted to Plan is and shall be personal to the Plan so licensed and shall not be assignable by any act of the Plan, directly or indirectly, without the written consent of [the Association]." The license agreements with all member plans are identical.

The Blue Shield licensing agreement similarly authorizes the member plans to use the Blue Shield name and marks for medical, surgical and other auxiliary health care services. The member plans are granted the right "to use [the] the service marks in commerce among the several states or in foreign commerce." This license agreement makes no mention of geographic areas or rights personal to the plan or the granting of other licenses inconsistent with the present grant. The license agreements with all member plans are identical.

At one time numerous Blue Cross and/or Blue Shield plans existed in Ohio. By 1985, however, apparently only four plans remained: Community Mutual Insurance Company ("Community Mutual") based in Cincinnati; Blue Cross and Blue Shield Mutual of Northern Ohio based in Cleveland; Blue Cross of Northwest Ohio based in Toledo; and Blue Cross of Central Ohio, predecessor of CBMIC, based in Columbus. In September, 1985, Community Mutual apparently began operating in areas of Ohio outside its exclusive geographic area. The Association subsequently filed a trademark infringement action against Community Mutual in the United States District Court for the Northern District of Ohio, Western Division. On October 18, 1985, that court denied the Association's motion for preliminary injunction. *Blue Cross and Blue Shield Association v. Community Mutual Insurance Co.*, Case No. C–85–7872. This decision was affirmed on appeal. *Blue Cross and Blue Shield Association v. Community Mutual Insurance Co.*, Case

No. 85–3871 (6th Cir.1985). Thereafter, all the Ohio plans began competing throughout the State of Ohio using the names and marks.

In May, 1987 the litigation in the Northern District of Ohio was settled. The settlement authorized all of the Ohio plans to compete throughout the State of Ohio using the Blue Cross and Blue Shield names and marks. Each plan agreed not to bring suit against any other Ohio plan to enforce its exclusive service area before January 1, 1991, when the "Assembly of Plans" is to complete its proceedings. The Assembly of Plans is an entity, wholly separate from the Association, composed of representatives of the Association and each of the member plans and formed to discuss and propose solutions to problems facing the Blue Cross and Blue Shield System, including whether to retain exclusive service areas. As part of the settlement of the Toledo litigation, Blue Cross of Central Ohio gained the Blue Shield license for the central Ohio service area. This license had previously been held by Community Mutual. Having acquired the Blue Shield license, Blue Cross of Central Ohio changed its name to Central Benefits Mutual Insurance Company (CBMIC). At some point during this time, Blue Cross of Northwest Ohio merged with Blue Cross and Blue Shield Mutual of Northern Ohio to become Blue Cross and Blue Shield Mutual of Ohio.

In the fact of increased competition in central Ohio, CBMIC decided to expand its markets outside the state. However, CBMIC was licensed to sell health care insurance only in Ohio, Indiana, and the District of Columbia. The application process to gain licenses in other states proved too lengthy, and therefore, CBMIC decided to purchase an insurance company that was already licensed to do business in other states. In May, 1987 CBMIC purchased First National Life Insurance Company, a corporation organized and existing under the laws of the State of Indiana. This company was basically defunct and was no longer writing insurance policies. Although its prior business solely involved life insurance, it owned licenses to sell health insurance in twenty states. The name of this new wholly-owned subsidiary of CBMIC was changed to Central Benefits National Life Insurance Company (CBNLIC).

Soon thereafter, CBNLIC began marketing health insurance outside of Ohio. Initially, CBNLIC concentrated on the contiguous states of Kentucky and Michigan. CBNLIC also entered the Tennessee market in late 1987. In 1988 CBNLIC expanded its operations into Arkansas, Illinois, Iowa, Kansas, Missouri, Nebraska, Oklahoma, and Wisconsin. CBNLIC plans to move into Arizona, Colorado, and North and South Dakota during 1989. Its strategy has been to "skim" the market by targeting employers of less than 100 employees. CBNLIC's marketing strategy is intended to take a small, profitable percentage of many markets while not dominating any one market. CBNLIC markets its insurance through independent agents and multiple line brokers. CBNLIC did not originally use the Blue Cross and Blue Shield names and marks in its out-of-state marketing.

The insurance offered by CBNLIC was not the same as that traditionally offered by Blue Cross and Blue Shield member plans. CBNLIC itself was and is not a Blue Cross and Blue Shield member plan. It is not bound by the ten membership standards that are requisites for member plans. CBNLIC offers only indemnity insurance in contrast to the prepaid service benefit insurance offered by member plans. Although there was evidence that CBNLIC does contract with a few health care providers, member plans contract with all or nearly all health care providers in their service areas. Finally, CBNLIC cannot offer its customers participation in the national programs offered by the Association such as the Inter–Plan Service Benefit Bank, the telecommunication system, and the new product networks.

CBNLIC's initial sales efforts were not successful, at least in part because CBNLIC was unknown to potential out-of-state customers. In fact, by July 29, 1987, CBNLIC had sold only three group health insurance policies. According to a memo-

randum of CBNLIC's Director of National Marketing, Steven Davis, the sluggish business was due to delays in printing and implementing promotional materials utilizing the Blue Cross and Blue Shield names and marks. The printing of the materials was being delayed because of an intracompany debate over whether to use the names and marks, and if so, how to employ them. In the interim, regional sales people and agents and brokers informed CBNLIC of their desire to use the names and marks. For example, E. Alan Gorlewski, Regional Manager for CBNLIC in Michigan, sent a memorandum dated July 16, 1987 to Steven Davis. Therein, under the caption, "Some of my general thoughts," he stated, "We also need to show our Cross & Shield on as many pieces of paper as possible (ie cards, letterhead, brochures, forms, etc.) This will give us & the broker credibility." Under the heading *"Issues"*, he stated, "the use of the Cross & Shield on all forms, etc. is going to be very important to employers and brokers. I would encourage us to push for this."

According to the testimony of Rebecca Lusk, Director of Corporate Communications for CBMIC and CNBLIC, the intracorporate debate as to whether and/or how to use the Blue Cross and Blue Shield names and marks had begun by the spring of 1987. The issue whether to use the names and marks was bandied about for the next several months. John B. Reinhardt, Jr., president and chief executive officer of both CBMIC and CBNLIC, was advised by counsel sometime during the spring of 1987 that the Blue Cross and Blue Shield marks should not be used outside the State of Ohio.

Q. Mr. Reinhardt, your attorneys recommended to you, did they not, that you not use the Blue Cross and Blue Shield marks out of state?

A. At one time I believe that was the recommendation.

Q. And when—at what time was that?

A. I am not sure, but it probably was at the beginning of our time when we began marketing on a national basis.

(September 7, 1988 Deposition of John B. Reinhardt, Jr. at 99.) *See also* Blue Cross Exhibit # 88. When Mr. Reinhardt was questioned as to why he did not follow his counsel's advice, he replied, "In the course of my 17 years' experience generally in this business there has been lots of advice, and I haven't always accepted other people's advice." *Id* at 110.

Finally, on August 12, 1987, in order to increase business, CBNLIC made its first decision to utilize the names and marks. This decision apparently changed several times thereafter. Rebecca Lusk was in fact directed to develop an independent logo for CBNLIC. On February 1, 1988, however, she was advised that CBNLIC was going to use the names and marks. This decision again was subject to change. In March, 1988 the option of using the independent CBNLIC logo was still being considered. In late spring of 1988, the final decision to use the names and marks was made.

The marks were placed on business cards, letterheads, and promotional materials used in presenting CBNLIC's health care insurance products. In particular, CBNLIC utilized a presentation folder for introducing its VICTORY health insurance product line to agents and brokers. Brochures describing specific health insurance products were placed inside the presentation folder. The folder had a sticker on the back with the name "CENTRAL BENEFITS NATIONAL" written in large bold type. Underneath this was CBNLIC's Columbus address. Below this in small print was the phrase, "A life insurance subsidiary of Central Benefits Mutual Insurance Company, a Blue Cross and Blue Shield Plan." The Blue Cross and Blue Shield marks were printed in blue ink immediately below the phrase, accompanied by the Blue Cross and Blue Shield names. The marks were identified as registered marks of the Association. A similar sticker was located on an outer flap of the folder. On this flap appeared the declaration that "[t]he quality options and unparalleled service of VICTORY are available from one company only: Central Benefits National Life Insurance Company." The inner centerpiece of the

folder contained the following statement: "Any VICTORY program will be supported by fast, accurate claims handling that has earned us higher overall performance ratings *than other Blue Cross and Blue Shield plans.*" (Emphasis added). The presentation folder, read as a whole, was ambiguous and misleading as to whether CBNLIC was a Blue Cross and Blue Shield plan and whether the insurance it sold was Blue Cross and Blue Shield Insurance. Approximately 5,000 of these presentation folders were printed in June, 1987. Steven Johnston, vice president of marketing for CBNLIC, testified that these folders were reprinted in the fall of 1988 and the misleading text was remedied. Nevertheless, the Blue Cross and Blue Shield names and marks were retained.

The Association offered into evidence the business card of one J. Dale Morgan, a broker for CBNLIC, which utilized the Blue Cross and Blue Shield marks printed in blue ink and the Blue Cross and Blue Shield names. The card was captioned "Central Benefits Brokerage Agency" with the "Brokerage Agency" in the characteristic Blue Cross/Blue Shield blue. Beneath this caption was the statement, "Representing Central Benefits National/A life insurance subsidiary of Central Benefits Mutual Insurance Company, a Blue Cross and Blue Shield Plan." Morgan's telephone number was also printed in the distinctive blue with the last four digits spelling out "BLUE". Steven Johnston testified that many times the agent or broker's business card would be attached to the front of the presentation folder. Johnston also testified that many of the brochures used in conjunction with the presentation folder contained language and symbols which might lead a potential customer to believe that the insurance being offered was Blue Cross and Blue Shield insurance from a member plan. Thousands of those brochures were printed through 1987, although they were apparently reprinted in the fall of 1988 to correct any misleading language. Nevertheless, the Blue Cross and Blue Shield names and marks were retained.

When CBNLIC began using sales materials containing the Blue Cross and Blue Shield marks and names and references to CBNLIC as a Blue Cross and Blue Shield plan, its business began to improve noticeably, even though it spent little or nothing on media advertising. Through January, 1988, CBNLIC sold less than 1000 contracts per month and sales totaled less than $200,000 per month. From February through September, 1988, however, CBNLIC's contract sales increased from approximately 3,000 per month to 9,000 per month and sales increased from approximately $500,000 to $1.5 million.

The Association presented evidence that many employers experienced actual confusion as to the nature of the insurance being sold by CBNLIC and the nature of CBNLIC itself. According to the deposition testimony of Susan Fyffe, administrative assistant to the chief executive of Greenup County, Kentucky, she received a bid from CBNLIC in June, 1988 to provide group health insurance for the county's employees. The bid was submitted by Dale Morgan. He furnished Mrs. Fyffe with his business card, which was identical to the one described above, and stated that he represented "Central Benefits of Blue Cross Blue Shield." (Hearing Transcript at II–73). She assumed that he represented Blue Cross and Blue Shield of Kentucky.

Morgan also gave Mrs. Fyffe a presentation folder identical to the one described above. The folder contained brochures entitled Comprehensive Major Medical Program; Central Benefits Classic Hospitalization, Medical/Surgical, and Major Medical Programs; and "What do you call unbeatable employee benefits?". On the lower right-hand front cover of the first two brochures was the name "CENTRAL BENEFITS NATIONAL" followed by the phrase, "A life insurance subsidiary of Central Benefits Mutual Insurance Company, a Blue Cross and Blue Shield Plan." Beneath this the Blue Cross and Blue Shield marks were printed in blue along with the Blue Cross and Blue Shield names. On the inside left-hand flap of these brochures was the following statement: "That's the philosophy that has governed Central Benefits

Blue Cross Blue Shield for nearly 50 years and now, its subsidiary, Central Benefits National Life Insurance Company. In that time, *Central Benefits has become one of the truly outstanding providers of Blue Cross and Blue Shield insurance coverage.*" (Emphasis added). The last brochure contained a similar configuration of the CBNLIC name and the Blue Cross and Blue Shield names and marks, except that they were printed on the back cover of the brochure instead of the front. The left-hand inside flap of this brochure contained the statement that "Central Benefits National is a life insurance subsidiary of Central Benefits Mutual Insurance Company, a Blue Cross and Blue Shield Plan with more than 50 years experience in employee benefits. The Blue Cross and Blue Shield logotypes mark us as one of the world's most trusted benefits companies." The inside centerpiece contained the following statement: "We can help you accommodate any client with *Classic Blue Cross and Blue Shield health programs.*" (Emphasis added). Mrs. Fyffe testified that the CBNLIC representatives did not clearly distinguish CBNLIC from Blue Cross and Blue Shield.

> [T]hey misrepresented theirselves [sic] to us by, on the front end, having Blue Cross Blue Shield written all over everything, trying to make us assume that it was a Blue Cross Blue Shield plan, yes. And at first we did assume that. Because, what else could you assume? It was written all over everything. The guy told me it was Blue Cross Blue Shield, Central Benefits Blue Cross Blue Shield as sure as I am sitting here.

(Hearing Transcript at II–80). Greenup County also received a bid from Blue Cross and Blue Shield of Kentucky, which it eventually accepted.

The Association also presented the deposition testimony of Kimberly Williams, credit and office manager for Builders Supply Company of Elizabethton, Tennessee. She was involved in the selection of group health insurance for the company's twenty-seven employees during the early part of 1988. One Dale Strothers contacted her about providing the insurance. She specifically asked for Blue Cross and Blue Shield insurance. Strothers replied that he sold insurance for several companies including Blue Cross and Blue Shield. He worked up a proposal which he represented was for Blue Cross and Blue Shield insurance and provided her with brochures which contained the Blue Cross and Blue Shield names and marks. The company decided to purchase this insurance based on the representations that it was Blue Cross and Blue Shield insurance.

Mrs. Williams did not question the authenticity of this insurance until she was approached by a representative from Blue Cross and Blue Shield of Tennessee. She informed the representative that her company had already purchased Blue Cross and Blue Shield insurance. He indicated to her that her company had not purchased Blue Cross and Blue Shield insurance since they had not purchased it from Blue Cross and Blue Shield of Tennessee. Approximately one week later she received the individual insurance cards from CBNLIC and discovered that they were not the distinctive Blue Cross and Blue Shield cards and did not contain the Blue Cross and Blue Shield names and marks. At this time she realized that CBNLIC had not sold her Blue Cross and Blue Shield insurance and was highly upset. The employees were also greatly agitated upon being informed that the new insurance was not Blue Cross and Blue Shield. The employees focused the blame upon Mrs. Williams and her supervisor. Mrs. Williams switched to Blue Cross and Blue Shield of Tennessee at the end of the initial coverage period.

According to the deposition testimony of Peggy Colvin, who received a bid for group health insurance from CBNLIC in 1988 on behalf of the City of Russell, Kentucky, "I just thought it was Blue Cross Blue Shield. It was very confusing." (Hearing Transcript at II–101). The Association presented depositions, affidavits, or declarations from representatives of eight other employers who had similar experiences with CBNLIC and brokers and agents representing it.

In late spring of 1987, the Kentucky Blue Cross and Blue Shield plan became aware of CBNLIC's activities in Kentucky. On June 19, 1987 the president of the Kentucky plan sent a letter to the president of the Association complaining about CBNLIC's use of the Blue Cross and Blue Shield names and marks in Kentucky. Representatives of the Association and the Kentucky plan met on July 13, 1987 to discuss the situation. It was decided that the representatives of the Association should meet with representatives of CBMIC and CBNLIC. Although a meeting was held on August 14, 1987, the content of the discussions is somewhat in dispute. CBNLIC contends that it stated clearly that it intended to continue use of the names and marks in Kentucky. It further contends that the Association's representatives agreed that something could be worked out in regard to some limited use of the marks by CBNLIC in Kentucky. The Association contends that it clearly expressed that no use of the names and marks in Kentucky would be appropriate without the authorization of the Kentucky plan. On October 13, 1987, the Kentucky plan again advised the Association in writing that CBNLIC was using the names and marks in Kentucky. The Association scheduled a mediation meeting for October 28, 1987. The issue discussed at this mediation meeting was whether CBNLIC could use a tag line, defined *infra*, including the names and marks in Kentucky. The Association agreed to this usage if the Kentucky plan would consent. The Kentucky plan would only agree to the use of the names, not the marks. A second mediation meeting was held on November 11, 1987 with no resolution of the dispute. Further negotiations were held between the Association and CBNLIC in December, 1987. On March 28, 1988 the Kentucky plan again notified the Association in writing that CBNLIC was using the names and marks in Kentucky. On May 6, 1988 CBMIC and CBNLIC filed the instant action. The Association counterclaimed on June 22, 1988 and filed the instant motion for preliminary injunctive relief on November 21, 1988.

According to the testimony of Bernard R. Tresnowski, president and chief executive officer of the Association, the exclusive service areas of the member plans have developed over the years out of custom and usage. In addition, the Association has developed regulations of general application regarding the use of the Blue Cross and Blue Shield names and marks. Many of these regulations are contained in the current Graphics Standards Manual which was issued in 1982 or 1983. Other regulations are contained the Service Mark Use Manual which is dated December, 1988. Chapter I, Section 8 of this Manual governs service mark use by subsidiaries and affiliates of member plans. It states, *inter alia:* "Use of the Service Marks by unlicensed Plan subsidiaries and affiliates may substantially impair efforts to protect the Service Marks from use by outsiders. Although the Plan subsidiaries and affiliates may be part of the overall business initiatives, use of the Service Marks must be restricted to the licensed organization." The only subsidiaries of member plans now licensed to use the names and marks are plan-controlled Health Maintenance Organizations. The exception to the general rule that no plan subsidiary can use the names and marks was necessitated by laws requiring Health Maintenance Organizations to be separate legal entities. Therefore, member plans could only develop Health Maintenance Organizations if they formed subsidiaries.

Use of the names and marks by unlicensed Plan subsidiaries and affiliates is limited to the following tag line. "A subsidiary (or affiliate) of Blue Cross and Blue Shield of Geography, Inc."

The tag line must:

a. be in an ink color other than blue;

b. appear only one time on a given piece of literature;

c. be in one size of small dignified type;

d. be placed well away from the name and/or logo of the Plan affiliated entity;

e. not include the Symbols (even as part of the Plan's signature);

f. not be used outside of the Plan's Service Area except with the agreement of the Plan in whose Service Area the tag line is to be used. (Requests for the agreement of other Plans are to be submitted in writing to the Association which will coordinate them.)

These regulations embody in essence the regulations formulated by Marvin C. Reiter, then general counsel for the Association, in a memorandum dated December 31, 1985.

CBNLIC attempted to show that the tag line policy for plan-controlled affiliates and subsidiaries has not been enforced uniformly. It demonstrated, for example, that Fort Dearborn Life Insurance Company, a subsidiary of Blue Cross and Blue Shield of Illinois, used the Blue Cross and Blue Shield marks on its sales materials and business cards. According to the affidavit of Michael J. Fishburn, who was employed by Blue Cross and Blue Shield of Illinois from December, 1976 through August, 1987, Fort Dearborn used the marks during the entire length of his employment. Mr. Fishburn had held various marketing positions, including regional marketing director. Fort Dearborn exclusively sold life insurance or related products.

According to the testimony of Roger G. Wilson, senior vice president and general counsel for the Association, a letter was sent to Fort Dearborn during November, 1987 seeking compliance with the Association's service mark policies. Further correspondence ensued and Mr. Wilson is now satisfied that Fort Dearborn has come into compliance with the Association's policy.

Over 600 instances of alleged infringement were reported by CBNLIC's counsel to Mr. Wilson prior to the hearing. Mr. Wilson testified that each instance has been investigated, many were found not to constitute infringement, and that most of the others have come into compliance with the Association's policies. Approximately thirty instances of infringement remain which the Association is actively seeking to remedy. Therefore, the Court concludes that, on the evidence presented thus far,

the Association has made a good faith effort to police its service names and marks.

## CONCLUSIONS OF LAW

 The Court has jurisdiction over the Association's claims pursuant to 28 U.S.C. §§ 1331, 1332, 1338(a), (b) and 15 U.S.C. § 1121. The Court has jurisdiction over CBNLIC's claims pursuant to 28 U.S.C. §§ 1331, 1332, 1337.

The legal standard for determining whether a preliminary injunction should issue in a Lanham Trade-mark Act case is as follows:

There must be a showing of (A) irreparable harm and (B) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 651 (6th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982).

The Court concludes that the Association has shown a strong likelihood of success on the merits of both its actions under 15 U.S.C. § 1114(1) and § 1125(a). According to 15 U.S.C. § 1114(1),

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake,

or to deceive shall be liable in a civil action by the registrant.

According to 15 U.S.C. § 1125(a),

Any person who shall affix, apply, or annex, or use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

It is undisputed that the names and marks used by CBNLIC in states outside Ohio are identical to the Blue Cross and Blue Shield service names and service marks owned by the Association. The questions that remain are whether CBNLIC has used the names and marks without the consent of the Association and whether CBNLIC's use of the names and marks has caused confusion about the nature of CBNLIC's relationship with the Blue Cross and Blue Shield System and the nature of the insurance products sold by CBNLIC.

▮ The likelihood of confusion generated by the alleged infringing use of the marks is a key issue in the context of determining whether or not to grant preliminary injunctive relief. *Frisch's Restaurant, Inc. v. Elby's Big Boy,* 670 F.2d at 647. The Sixth Circuit has identified eight criteria for determining the likelihood of confusion: "(1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; [and] (8) likelihood of expansion of the product lines." *Id.* at 648.

The Blue Cross and Blue Shield names and marks are strong and famous nationwide as conceded by the plaintiffs and as

recognized by other courts. *See, e.g., Blue Cross and Blue Shield Association v. Blue Cross Mutual Clinic, Inc.,* 612 F.Supp. 41, 44 (S.D.Fla.1985); *National Association of Blue Shield Plans v. Lovelace,* 435 F.Supp. 115, 117 (N.D.Cal.1977). The services offered by CBNLIC with which it used the marks are the same as those offered by all member plans, namely, health care insurance. As noted above, the names and marks used by CBNLIC are identical to those owned by the Association. Both CBNLIC and member plans use brokers and sales agents to market their health insurance. CBNLIC has targeted employers with less than 100 employees. The person or persons responsible for purchasing health insurance at many of these employers is typically someone who has many responsibilities and is not sophisticated in the health care insurance market. The evidence strongly suggests that CBNLIC which is not a member plan or licensee of the marks, intentionally appropriated the good will of the Blue Cross and Blue Shield names and marks outright, by identifying itself with its parent, CBMIC, which is a member plan and licensee of the marks. CBNLIC is planning to move its operations into all twenty states in which it is licensed to sell health insurance.

The evidence clearly established that CBMIC's activities have resulted in actual confusion in the marketplace. The Association has presented compelling evidence that many if not most of the employers approached by brokers or agents on behalf of CBNLIC thought that the insurance being sold was Blue Cross and Blue Shield insurance. In some cases the employers and their employees did not become aware that the coverage was not Blue Cross and Blue Shield insurance until they were provided with individual insurance identification cards. Much of the sales materials that CBNLIC provided to the brokers and agents contained the Blue Cross and Blue Shield names and marks and were confusing as to whether CBNLIC was a Blue Cross and Blue Shield member and whether it was offering Blue Cross and Blue Shield insurance. The instant case can be distin-

**1434**

guished from the Toledo litigation. Judge Potter denied preliminary injunctive relief on the ground that the Association had failed to demonstrate a likelihood of confusion. *Blue Cross and Blue Shield Association v. Community Mutual Insurance Corp.*, Case No. C85–7872 at 7–8. In the instant case, the Association has conclusively established actual confusion. Therefore, the Court finds that the Association has demonstrated a substantial likelihood of success on the merits of its Lanham Act claims.

■ CBNLIC argues that the Association has not protected its service name and mark rights, and therefore, has waived, abandoned, or is estopped from asserting its rights. The Court disagrees. Waiver is the intentional relinquishing or abandonment of a known right. *Barker v. Wingo*, 407 U.S. 514, 525, 92 S.Ct. 2182, 2189, 33 L.Ed.2d 101 (1972). Estoppel by acquiescence occurs where "conduct on the plaintiff's part amounted to an assurance, express or implied, that the plaintiff would not assert his trademark rights against the defendant." *National Council of Young Men's Christian Association v. Columbia Young Men's Christian Association*, 8 U.S.P.Q.2d 1682, 1685, 1988 WL 144985 (D.S.C.1988). Estoppel by laches occurs where the trade mark owner's delay is inexcusable and has resulted in prejudice to innocent users. *Menendez v. Holt*, 128 U.S. 514 (1888). On the evidence presented to the Court, CBNLIC has not demonstrated a likelihood of success in showing waiver, abandonment, or estoppel. The Association has been active in responding to complaints of the misuse of the names and marks by investigating and notifying alleged infringers. Although there are certainly instances of infringement occurring throughout the country, CBNLIC has not demonstrated that the Association has been anything but diligent in policing its names and marks. Likewise, the Association's delay in seeking preliminary injunctive relief was not unreasonable and in any event is justifiable. The Association first sought a settlement of the dispute and then did not move for a preliminary injunction until it had gathered sufficient evidence of actual confusion to support injunctive relief.

■ CBNLIC contends that the Association has utilized the licensing structure for the names and marks in such a way to restrain free trade in violation of the antitrust laws. Trademark rights, even if valid, cannot be used in a way that violates the antitrust laws. 15 U.S.C. § 1115(b)(7); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598–99, 71 S.Ct. 971, 974–75, 95 L.Ed. 1199 (1951). However, the Court concludes that CBNLIC does not have standing to assert this defense. Only a party who is directly and adversely affected by the alleged antitrust violations can raise the antitrust defense against claims of trademark infringement. *Rolls–Royce Motors Limited v. A & A Fiberglass, Inc.*, 428 F.Supp. 689, 701 (N.D.Ga. 1976); *Coca–Cola Co. v. Howard Johnson Co.*, 386 F.Supp. 330, 337 (N.D.Ga.1974). CBNLIC is not a licensee of the names and marks and therefore has not been injured by the exclusive service area licensing arrangement. CBNLIC is not bound by the licensing agreements nor need it comply with the ten membership standards. As demonstrated *supra*, the insurance it sells is not the same as that sold by member plans. CBNLIC and, indeed, member plans themselves, are not restricted from competing in other geographic areas. They are merely restrained from using the Blue Cross and Blue Shield names and marks in other areas. Although plan subsidiaries are allowed limited usage of the Blue Cross and Blue Shield names pursuant to the tag line policy, this does not confer any legally enforceable rights on a subsidiary. In fact the opposite is true insofar as the policy restricts a subsidiary's use of the names in referring to its relationship to its parent.

■ In light of the strong showing of confusion made by the Association, the Court concludes that it has also demonstrated irreparable harm. Trademark infringement by nature is generally irreparable and the showing of a high probability of confusion almost invariably gives rise to irreparable harm. *Church of Scientology International v. Elmira Mission of the*

*Church of Scientology,* 794 F.2d 38, 41 (2d Cir.1986); *Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 858 (7th Cir.1982); *Wendy's International, Inc. v. Big Bite, Inc.,* 576 F.Supp. 816, 825 (S.D.Ohio 1983). Furthermore, the balance of hardships favors the Association. CBNLIC knew or should have known that its use of the Blue Cross and Blue Shield names and marks would be an infringement of the license agreements and would constitute a false designation of origin or a false description or representation. Therefore, any harm engendered by CBNLIC's investment in promotional materials utilizing the names and marks is not entitled to consideration. A party who willfully proceeds to expend funds on infringing activity cannot claim the loss of those funds as a ground for denying preliminary injunctive relief. *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.,* 560 F.2d 1325, 1333–34 (7th Cir.1977), *cert. denied,* 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978). In addition, public policy concerns weigh in favor of preliminary injunctive relief in order to avoid confusion in the marketplace.

In conclusion, the Association's motion for preliminary injunctive relief is GRANTED.

It is so ORDERED.