**BLUE CROSS AND BLUE SHIELD ASSOCIATION, Plaintiff,**

v.

**GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., Defendant.**

**Civ. A. No. 89–0999–A.**

United States District Court, E.D. Virginia, Alexandria Division.

March 30, 1990.

William R. Jentes, James M. Amend, Alexander F. MacKinnon, Kirkland & Ellis, Chicago, Ill., Regis E. Slutter, Burns, Doane, Swecker & Mathis, Alexandria, Va. (Paul F. Kilmer, Mason, Fenwick & Lawrence, Washington, D.C., Roger G. Wilson, Elliott C. Bankendorf, Blue Cross and Blue Shield Ass'n, Chicago, Ill., of counsel), for plaintiff Blue Cross and Blue Shield Ass'n.

Charles J. Steele, Jacqueline M. Saue, Sandra Hardgrove Andrade, Mary Atchley Jester, Foley & Lardner, Washington, D.C., Peter G. Mack, Foley & Lardner, Schwartz, Jeffery, Schwaab, Mack, Blumenthal & Evans, Alexandria, Va., Michael A. Grow, Ward, Lazarus & Grow, Washington, D.C., for defendant Group Hospitalization and Medical Services, Inc.

## MEMORANDUM OPINION

CACHERIS, District Judge.

Plaintiff Blue Cross and Blue Shield Association ("Association") filed this action on July 7, 1989 against the defendant Group Hospitalization and Medical Services, Inc. ("D.C. Plan") seeking a Declaratory Judgment and injunctive relief under the Lanham Trade–Mark Act, as amended, 15 U.S.C. § 1114 *et seq.*

Defendant D.C. Plan has denied plaintiff's allegations and has raised affirmative defenses of laches, estoppel, selected enforcement and waiver. In addition, in its Answer the D.C. Plan has asserted a counterclaim which alleges tortious interference with contractual relations and prospective

business relations as well as a violation of the Sherman Act, 15 U.S.C. § 1.

For reasons set forth below, Judgment is entered in favor of the Association on its Complaint for Declaratory Injunctive Relief. Judgment is also entered in favor of the Association on the counterclaims brought against it by the D.C. Plan.

## I. *Findings of Fact*

After reviewing the pleadings, authorities, and arguments of counsel, the court finds the facts to be as follows:

The court adopts the corrected Stipulation of Uncontested Facts.

Plaintiff Blue Cross and Blue Shield Association ("Association") is a not-for-profit membership corporation organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois. The Association was formed in 1982, through the merger with the former Blue Cross Association and Blue Shield Association. (Uncontested Fact ¶ 1)

The purposes of the Association are, *inter alia,* to promote the betterment of public health and security, to secure the widest public acceptance of the principles of voluntary nonprofit prepayment of health services, to protect the Blue Cross and Blue Shield names and symbols, and to develop and maintain membership standards for the corporation. (Plaintiff's Ex. 5).

Bernard R. Tresnowski is President and Chief Executive Officer of the Association. (Trial Transcript ("Tr.") Tr. 77).

The Association is not a health underwriter and does not sell health insurance products or services. Rather, the Association provides a variety of support programs and services to Member Plans which, in turn, sell prepaid health care financing insurance services. (Tr. 83, 85).

The support programs and services provided by the Association include lobbying and the operation of the Inter–Plan Services Benefit Bank.[1] Pursuant to the provider contract, the host Plan submits a claim to the Inter–Plan Bank, which operates as a clearing house; the home Plan is ulti-

mately responsible for reimbursing the host Plan through the Bank. (Tr. 113).

The Association has eighty-six Regular, Associate, and Affiliate Members. Each member is a not-for-profit hospital and/or medical surgical benefits plan that offers health care financing and related services to the public. There are seventy-four Regular Members of the Association located in the U.S. and Puerto Rico. Two Associate Members are located in Canada and Jamaica. Three Affiliated Members are located in Australia, Canada and the United Kingdom. (Plaintiff's Ex. 7).

The Blue Cross and Blue Shield word and design marks are federally registered in the Association's name with the United States Patent and Trademark Office. (Stipulation No. 4, Tr. 90–91).

Defendant Group Hospitalization and Medical Services, Inc. ("D.C. Plan") is a not-for-profit corporation established by an act of Congress, with its principal place of business in the District of Columbia. The D.C. Plan was formed in 1985 through the merger of Group Hospitalization, Inc. and Medical Services of the District of Columbia. (Uncontested Facts ¶ 2; Defendant's Ex. 1410).

The D.C. Plan is a Member Plan of the Association. (Uncontested Facts ¶ 3).

Joseph P. Gamble is the President and Chief Executive Officer of the D.C. Plan. (Tr. 663).

The parties have been involved in previous litigation. There was a lawsuit in this court styled *Group Hospitalization and Medical Services, Inc. v. Blue Cross and Blue Shield of Virginia,* CA No. 85–1123–A (E.D.Va. April 8, 1986). Proceedings here before Judge Bryan resulted in an Order which defined the geographic scope of the D.C. Plan's license to use the Blue Cross and Blue Shield Marks.

## A. *Origin and History of the Blue Cross and Blue Shield Marks*

The first prepaid hospital plan, which eventually developed into a Blue Cross Plan, began at Baylor University in 1929.

---

1. The Inter–Plan Bank allows a subscriber of one Plan to travel anywhere in the U.S. and receive covered services from another plan.

The Association, through the Inter–Plan Bank, facilitates payment between the two plans. (Tr. 84).

The American Hospital Association ("AHA") sponsored this Plan and other subsequent Plans, operating as a clearinghouse and trade association for the Plans. (Plaintiff's Ex. 3; Tresnowski, p. 92).

The "Blue Cross" was adopted in 1939 as the official emblem of those Plans that conformed to the AHA's approval standards. (Plaintiff's Ex. 3).

On March 1, 1954, the AHA and approved individual Plans entered into an Agreement for use of the Blue Cross name and design ("the Mark"). Pursuant to this Agreement, the Plans assigned their rights in the Blue Cross Mark to the AHA. The stated purpose of this Agreement was to create a single owner of all rights in the Blue Cross Mark for the benefit and protection of all the Plans. The Agreement provided as follows:

"[AHA] and the Plans recognize that there should be a sole, exclusive ownership and control of all rights, as hereinafter set forth, to the words Blue Cross and the design of a blue cross, in order that the words Blue Cross and/or the design of the blue cross may not be used in such a manner as to deceive the public, but to maintain and protect, on behalf of all parties hereto, the good will symbolized by the words Blue Cross and the design of a blue cross."

The Plans further provided:

"The words Blue Cross and the design of a Blue Cross are known and recognized in the United States and in foreign countries as designating plans for prepayment of hospital care and related services, sponsored and approved by [AHA] under an approval program."

The Agreement also provided:

"All right, title and interest in and to the words Blue Cross and the design of a blue cross, as service marks, for a prepayment plan for hospital care and related services, and the words Blue Cross in and as a part of the trade name and/or corporate title of said Plans ..."

The Agreement further provided that the rights assigned to AHA included the right to hold the registered trade name and service mark.

The Member Plans acknowledged that the Agreement applied to all ownership rights when they agreed that:

"[AHA] shall hold and exercise any and all rights of ownership in and to the words Blue Cross and/or a design of a blue cross, as service marks, whether or not derived from this agreement...."

The Agreement provided that the transfer of the Blue Cross name was in trust to AHA. (Plaintiff's Ex. 3).

On June 30, 1972, pursuant to the Blue Cross Ownership Agreement, the AHA assigned all of its rights in the Blue Cross Mark to the Blue Cross Association ("BCA"). The Agreement confirms that, as between the contracting parties, Blue Cross Association owns all the rights in the Mark. In this Agreement, the Member Plans explicitly affirmed the assignment of rights made in the March 1, 1954 Agreement. (Plaintiff's Ex. 4, ¶ 1). The AHA, with the express consent of the Plans, then assigned all of these rights, without geographic limitation, to the Blue Cross Association. (Plaintiff's Ex. 4, ¶ 2).

Also on June 30, 1972, each Member Plan entered into a License Agreement with the BCA, which granted exclusive rights to each Member Plan to operate within its own defined geographical area. The rights of the BCA in the Blue Cross Mark were transferred to the Association upon the merger of Blue Cross Association and Blue Shield Association in 1982. (Defendant's Ex. 946).

The origin and history of the "Blue Shield" name and mark parallel that of the "Blue Cross." On December 1, 1952, pursuant to the Agreement Relating To The Collective Service Mark "Blue Shield," all of the Blue Shield Plans, including the predecessor to what is now the D.C. Plan, transferred their rights in the Blue Shield name and mark to the Blue Shield Medical Care Plans, a predecessor to the Association. (Plaintiff's Ex. 2). The ownership rights in the Blue Shield name and Mark passed to Blue Shield Association ("BSA") in 1977 and then to the Association upon

the merger of Blue Cross and Blue Shield in 1982.

The Association owns twenty-three United States registrations for the Blue Cross and Blue Shield names and symbols ("the Marks"). The D.C. Plan has admitted that the Association owns these U.S. registrations for the Marks. (Plaintiff's Ex. 8; Answer).

### B. History and Current Status of the Association's Foreign Registration Efforts

After the assignment of rights to the American Hospital Association pursuant to the 1954 Agreement, the AHA filed applications to register the Marks in foreign countries. (Plaintiff's Ex. 728, 869).

In the 1950's, 1960's and early 1970's, AHA registered the Blue Cross Mark throughout Latin America, the Caribbean and Europe. By June 30, 1972, AHA held thirty-two registrations in twenty-five countries. (Plaintiff's Ex. 10A).

Pursuant to the 1972 Ownership Agreement, the AHA, with the approval of the Member Plans, assigned these foreign registrations to BCA. The BCA continued to register the Blue Cross Mark abroad. Following the merger of BCA and BSA, the Association has continued these foreign registration efforts. (Plaintiff's Ex. 1104, 1108).

As of January 19, 1990, the Association held 192 registrations in fifty-one foreign countries.[2] (Plaintiff's Ex. 10B). In addition, as of January 19, 1990, the Association has 241 applications pending in another 48 foreign countries. (Plaintiff's Ex. 10).

The Association's foreign registration and application efforts have been known and, with the exception of the D.C. Plan, supported by the Member Plans. (Plaintiff's Ex. 13, 14).

From the mid-fifties to the present, the Association and its predecessors have protected the Mark against third-party infringers operating in foreign countries. For example, the Association obtained preliminary injunctive relief against a clinic, located in India, from operating under the name Blue Cross and using the Blue Cross symbol. (Plaintiff's Ex. 565). The Association has also pursued infringements in Australia, Guatemala, and Hong Kong. (Plaintiff's Ex. 182, 187, 190).

### C. The Association's Direct Involvement with the D.C. Plan: The Federal Employee Program

Since 1960, the Association has operated a government-wide service benefit plan for federal employees (the "FEP") pursuant to a contract with the United States Civil Service Commission. Since the creation of the FEP, the Association has subcontracted (through a Plan Participation Agreement) with the D.C. Plan to underwrite and service the FEP for federal employees working in the District of Columbia and abroad. (Plaintiff's Ex. 17).

The Association and the D.C. Plan have also entered into an Operations Center Agreement which requires the D.C. Plan to act as a processing facility for the Plans that participate in the FEP. The Operation Center Agreement provides that

> All responsibility and authority for establishing and changing policies, practices and procedures for the administration of the Program other than practices and procedures relating to the internal operations of GHI [the D.C. Plan] reside in the Associations or their delegate, the Board.

(Plaintiff's Ex. 18).

The Association distributes a variety of materials overseas to promote the FEP. These materials display the Blue Cross and

---

**2.** These include Algeria, Argentina, Australia, the Bahamas, Belgium, Bermuda, Bolivia, Brazil, Burundi, Chile, Columbia, Costa Rica, Cuba, the Dominican Republic, El Salvador, Ethiopia, France, Guam, Guatemala, Guinea, Honduras, Hong Kong, Italy, Jamaica, Japan, Jordan, Kenya, South Korea, Liberia, Liechtenstein, Luxembourg, Malawi, Mexico, Morocco, the Nether-

lands, the Netherlands Antilles, Norway, Cameroon, Panama, Paraguay, Peru, the Philippines, Poland, Portugal, Puerto Rico, Rwanda, the Seychelles, South Africa, Southwest Africa (Namibia), Switzerland, Transkei, Tunisia, Turkey, Uruguay, U.S.S.R., Zaire, and Zimbabwe. (Plaintiff's Ex. 10B).

Blue Shield Marks, with the explicit legend "Registered Marks Blue Cross and Blue Shield Association." (Plaintiff's Ex. 204–31).

The Association also publishes newsletters providing information regarding the FEP. The newsletters have been sent to FEP subscribers living abroad since 1981. The newsletters bear the Blue Cross and Blue Shield Marks with either the name "Blue Cross and Blue Shield Association," or "Reg. Marks of the Blue Cross and Blue Shield Association." (Plaintiff's Ex. 235, 303, 532). In addition, since 1982 the Association has sent a package of materials to all new FEP subscribers which includes a "welcome letter," brochure and pamphlet. The materials bear the Marks and name "Blue Cross and Blue Shield Association." (Plaintiff's Ex. 232, 233, 236).

The D.C. Plan also distributes materials bearing the Marks to FEP subscribers in foreign countries, including:

(i) Identification cards bearing the Blue Cross and Blue Shield names and symbols and the Association's name to all new federal employees. (Plaintiff's Ex. 242–46);

(ii) FEP Overseas Claims Forms and checks in payment of FEP overseas claims, both bearing the Blue Cross and Blue Shield Marks. (Plaintiff's Ex. 237–40, 241);

(iii) A brochure entitled "A Guide to Your Explanation of Benefits." This brochure displays the Blue Cross and Blue Shield names and symbols and the legend "Registered Marks Blue Cross and Blue Shield Assn." (Plaintiff's Ex. 234).

The D.C. Plan has admitted that these foreign uses of the Marks in connection with the FEP inure to the benefit of the Association. (Gamble Dep. at 189–90).

D. *Foreign Involvement of the Association and Foreign Recognition of the Marks*

The Association and its predecessors have used the Marks in a variety of ads appearing in foreign publications, such as *Business Insurance, The International Herald Tribune, Fortune Magazine*, and *Forbes* magazine. (Plaintiff's Ex. 128, 144, 136, 142).

The Association sponsored the 1988 U.S. Olympic Team and used the Blue Cross and Blue Shield Marks to advertise its sponsorship. (Plaintiff's Ex. 145–49).

A variety of publications have published articles that discuss the Association, such as *The International Herald Tribune, Financial Times, The Guardian, The Economist*, and *Facts on File*. (Plaintiff's Ex. 150–57).

The Association has, since August 1983, published a quarterly journal, *Inquiry*, which is distributed throughout the world. (Plaintiff's Ex. 106–10, 181).

The Association is a member of the International Federation of Voluntary Health Service Funds ("IFVHSF") which is comprised of 160 independent non-profit, prepaid health plans from around the world. (Plaintiff's Ex. 50, 1110). Representatives of the Association and its Member Plans have attended each of IFVHSF's biennial meetings. (Plaintiff's Ex. 54–65).

The IFVHSF has distributed several publications that contribute to the goodwill and international fame of the Marks of the Association. For example, in June 1976, IFVHSF began to distribute a publication called *"Bulletin"* which contained articles about the Association and its Member Plans. (Plaintiff's Ex. 96–99).

IFVHSF also publishes a regular newsletter which often contains articles describing recent activities of the Association. Within these articles are references to the Association's ownership and use of the Marks. (Plaintiff's Ex. 71–91).

IFVHSF members from around the world have traveled to the U.S. to attend the Association's training programs. (Plaintiff's Ex. 72).

E. *The D.C. Plan's Foreign Registration Strategy*

In 1985, the D.C. Plan decided to secretly register the Marks for its own benefit and use in foreign countries. On October 1, 1985, Richard Groppe ("Groppe") was employed by the defendant in its International

Division. He assumed responsibility for secretly registering the Blue Cross and Blue Shield Marks in foreign countries. (Plaintiff's Ex. 271).

On October 15, 1985, the D.C. Plan filed its first application in Barbados and, on October 28, 1985, filed additional applications in Spain and the United Kingdom. (D.C. Plan's Answer to 3rd Set of Interrogatories # 1; Plaintiff's Ex. 30, 31).

By the end of 1985, the D.C. Plan had filed ten applications to register the Marks in ten countries, and, by the first half of 1986, the D.C. Plan had filed another fifteen applications to register the Marks. (Plaintiff's Ex. 30, 31).

On August 4, 1986, Groppe sent a memorandum to Gamble on the status of the D.C. Plan's secret registration strategy. The memo stated that the D.C. Plan would inform the Association of its foreign registration efforts after they had been completed. However, the memorandum also indicated Groppe's belief that the D.C. Plan's secret strategy would be discovered by the Association before the foreign registrations were achieved. On this point the memorandum stated, "Before GHMSI can secure all trademark registrations we want worldwide, BSBSA will discover our activity." (Plaintiff's Ex. 35).

On June 21, 1985, in a letter to all Member Plans and the Association describing his overseas plans, Gamble gave no indication that the D.C. Plan was planning to register the Marks in its own name in foreign countries. (Plaintiff's Ex. 309).

In the spring and summer of 1986, the D.C. Plan sent a series of letters to the other Member Plans, encouraging their participation in the D.C. Plan's international hospital network and claims center. In these letters, the D.C. Plan never suggested that it was registering the Marks in its own name in foreign countries. Quite to the contrary, the D.C. Plan enclosed materials with these letters which acknowledged the Association as the owner of the Marks. (Plaintiff's Ex. 310, 292, 291).

In the August 4, 1986 memo, Groppe discussed the possibility that the Association would form a task force to study the international protection of the Marks and suggested that the D.C. Plan employ a strategy to block the formation of such a task force or at least neutralize its impact. (Plaintiff's Ex. 35).

In response to a request from the Association for additional information on the nature of the D.C. Plan's foreign programs, Gamble sent a letter on October 7, 1986 to Tresnowski failing to disclose that the D.C. Plan had filed applications to register the Marks abroad. (Plaintiff's Ex. 315). Gamble enclosed brochures that the D.C. Plan used to promote its international activities. The brochures identify the Association as the owner of the Marks. (Plaintiff's Ex. 291–92). Each of these brochures explicitly bore the legend, "Reg. Marks of the Blue Cross and Blue Shield Association." This was obviously an attempt by the D.C. Plan to conceal its foreign registration efforts from the Association.

The Association was unaware in 1985 and in the first part of 1986 that the D.C. Plan had undertaken a program to register the Blue Cross Blue Shield Marks, on its own, outside the United States. (Tr. 210).

In late 1986, after unsuccessfully attempting to register the Marks in the United Kingdom, the Association learned that the reason for the rejected application was because the D.C. Plan had already filed an application for the Marks in the United Kingdom in its own name. (Plaintiff's Ex. 318).

The D.C. Plan ignored the Association's numerous requests to withdraw its United Kingdom application and assign it to the Association. (Plaintiff's Ex. 319–321, Gamble Dep. at 573–74).

Thereafter, the Association took prompt steps to oppose the D.C. Plan's unilateral foreign registration efforts whenever they came to light and formed an International Service Mark Task Force to develop a program to protect all the Plans. (Plaintiff's Ex. 330).

In October 1986, the Association discovered that the D.C. Plan had also filed applications to register the Marks in Spain. The D.C. Plan failed to provide any information

in response to questions from the Association concerning the Spanish registration efforts. (Plaintiff's Ex. 330).

On November 9, 1987, Tresnowski wrote Gamble regarding the Association's applications in Europe, Latin America, and elsewhere, as well as the D.C. Plan's own registration efforts in Bolivia, Benelux, Chile, Colombia, Denmark, Haiti, Italy, Paraguay, Spain, the United Kingdom, Uruguay, and Venezuela. In the letter, Tresnowski advised Gamble that the D.C. Plan's attempt to register the Marks in its name was a violation of the Ownership and Licensing Agreement. (Plaintiff's Ex. 322). The D.C. Plan never responded to this letter.

In 1987, the Association learned of the use of the Marks by the D.C. Plan in connection with the offering of a health benefits plan in Latin America, pursuant to an arrangement with Universal Insurance Broker, Corp. (Plaintiff's Ex. 324, 380).

The D.C. Plan's arrangement with Universal Insurance Broker, Corp. ("Universal") was evidenced by a brochure which espoused the benefits of this health care program. One of the major advantages to this Program, according to the brochure, was access to the "Recognized Blue Cross and Blue Shield ID card." In this vein, the brochure continued by stating that "a Blue Cross and Blue Shield Card helps you gain access to over 7,000 hospitals in the U.S. and around the world that participate in the Blue Cross and Blue Shield system." The brochure, however, did not mention that the Association and the Member Plans opposed this entire arrangement. (Plaintiff's Ex. 324).

The Association objected to the D.C. Plan's use of the Marks in connection with the arrangement with Universal, In response, the D.C. Plan attempted to conceal its activities and sought to delay the Associations investigation. (Plaintiff's Ex. 323, 324, 325).

On July 10, 1987, the Association reiterated its position to Universal that the Association owns the Marks worldwide and that the D.C. Plan was not authorized to use the Marks outside the U.S. (Plaintiff's Ex. 326).

Universal forwarded the Association's July 10, 1987 letter to the D.C. Plan. In an internal memorandum from Kathleen Flynn (head of the D.C. Plan's Latin American efforts) to Groppe, Flynn relayed the suggested strategy of Jackie Saue, D.C. Plans legal counsel. The memorandum stated

"She [Saue] would like [Universal] to send another 'innocent' letter requesting additional information regarding Treaty of Paris and the Nat'l Assn's trademark filings in *specific* countries in Latin America. She feels that it would (1) buy us some time and (2) perhaps help [the D.C. Plan] find out more about where Nat'l Ass'n has filed for trademark."

(Plaintiff's Ex. 327). (Emphasis in original).

In January 1988, Universal asked the D.C. Plan whether Universal could publicize its relationship with the D.C. Plan in the Miami, Florida area. (Plaintiff's Ex. 328). The D.C. Plan responded that it would not be acceptable to publicize within the U.S. because the Association was monitoring the D.C. Plan. The letter stated:

As you are aware, the Blue Cross and Blue Shield National Association is monitoring our relationship with you. We do not want to create any situations which would allow them to take legal action against either Universal Insurance Broker (UIB) or BCBSNCA in the State of Florida or anywhere else in the continental United States.

(Plaintiff's Ex. 329).

In October 1988, the D.C. Plan considered opening up a subsidiary to operate as a direct insurance company in Barbados. The D.C. Plan wished to conceal the Barbados initiative from the Association because the Barbados subsidiary would be a for-profit company and would use the Marks. (Plaintiff's Ex. 521).

In March 1987, the D.C. Plan entered into an agreement with a Venezuelan insurance group, Grupo Consolidado. The Grupo Consolidado program provided for the distribution of identification cards bearing the Blue Cross and Blue Shield Marks to

Venezuelan subscribers. Pursuant to a marketing survey seeking to determine Venezuelan familiarity with the Blue Cross and Blue Shield Marks, Grupo Consolidado found that Blue Cross and Blue Shield "... is widely known from an advertising standpoint. Most of the group believe it is a large insurance company operating in the USA." (Plaintiff's Ex. 161).

In 1987, the D.C. Plan entered into an agreement with a Mexican company, Grupo Nacional Provencial ("GNP"), to offer health insurance in Mexico under the Blue Cross and Blue Shield Marks. This program included the use of Blue Cross and Blue Shield identification cards that could be brought to the U.S. to present to hospitals anywhere in the country. During negotiations with GNP, the D.C. Plan clearly represented itself as authorized by the Association to enter into such an agreement. For example, in a "pitch" letter from Groppe to GNP, it was stated that

> the Blue Cross and Blue Shield system is the largest provider of health care insurance in the United States. Nearly one half of the U.S. population receives its health care coverage through Blue Cross and Blue Shield. We believe these services offer unique advantages to our members and allow us to operate as a very successful insurance company in the American and international marketplace.

(Plaintiff's Ex. 444).

In May 1988, the D.C. Plan entered into an agreement with a French health care provider, Federation Nationale de la Mutualite Francaise ("FNMF"). In a press release issued in the U.S., both the D.C. Plan and FNMF indicated that the purpose of their agreement was to issue Blue Cross and Blue Shield identification cards to members of the FNMF in France, allowing French vacationers "to use America's Blue Cross and Blue Shield card to pay for hospital care when they need it." (Plaintiff's Ex. 426). FNMF stated in a press release, "Our subscribers will be able to access the Blue Cross and Blue Shield participating hospitals worldwide." (Plaintiff's Ex. 426).

In 1989, the D.C. Plan began two new programs in France through a French insurance company, GAN. The programs were called "Plan Sante" and "Remy Martin." Both plans included the issuance of Blue Cross and Blue Shield identification cards which could be used in the U.S. (Plaintiff's Ex. 344, 389). A brochure issued by these plans indicated that "Today, Blue Cross and Blue Shield is the most important private provider on a worldwide scale for health related risks: 34% of the American market, 110 million members world-wide." The brochure also indicated that the organization has the status of a mutual insurance company, operating as a federation of 76 Blue Cross and Blue Shield companies across the U.S.—all of which may be accessed via a single common card. (Plaintiff's Ex. 395).

In September 1988, the D.C. Plan entered into a contract with a Japanese insurance company, Yasuda Fire and Marine Insurance Company ("Yasuda"). (Plaintiff's Ex. 365). Under the terms of the contract, the D.C. Plan would provide services for the Yasuda subscribers throughout the entire U.S. The contract also provided that an identification card bearing the Blue Cross and Blue Shield Marks would be issued to Yasuda subscribers for use in the United States. (Plaintiff's Ex. 365).

Yasuda thought it was dealing with the Blue Cross and Blue Shield Association, and not merely one of its Member Plans. For example, the President of Yasuda, in remarks made at a "signing ceremony," stated, "It is [with] great pleasure for me to see [that] our business tie-up with Blue Cross Blue Shield, the largest medical treatment supply organization in the U.S.A., has been realized. (Plaintiff's Ex. 440).

This belief of Yasuda was not unfounded—indeed it was purposefully cultivated by the D.C. Plan. For example, after being asked numerous questions by Yasuda concerning the D.C. Plan's relationship with the Association, Gregory Kryza (the D.C. Plan's Regional Director for the Pacific Rim) ("Kryza") wrote in an internal memorandum:

> Rather than become involved in this kind of quizzing, I decided to finesse them and

gave them a 10 minute briefing on Blue Cross and Blue Shield with particular emphasis on the high technology that is used in claims adjudication, the state of the art techniques that are used for cost containment and the hospital network both inside and outside the United States. (Plaintiff's Ex. 435).

The D.C. Plan also wished to conceal from other Member Plans and the Association its deal with Yasuda. For example, a November 1988 memorandum to Kryza from Sudhir Vasudeva of the D.C. Plan discussed whether to inform other Member Plans and the Association of the D.C. Plan's agreement with Yasuda. Vasudeva advised against such notification, citing the need to maintain low advertising levels. (Plaintiff's Ex. 334).

On October 20, 1989, the Association wrote Yasuda indicating that the D.C. Plan was illegally operating in Japan and elsewhere. (Plaintiff's Ex. 500).

In February of 1989, the D.C. Plan entered into a program with a British company, Western Provident Association ("WPA"). A brochure touting this venture declared that subscribers would have access to "over 90% of all hospitals in the U.S. and Canada, and hospitals and clinics in cities and towns in over 40 other countries." (Plaintiff's Ex. 446).

Following the consummation of the WPA–D.C. Plan joint venture, a February 25, 1989 article in the *London Times* stated that the WPA "has teamed up with the U.S. Blue Cross and Blue Shield schemes to cover 90 percent of U.S. and Canadian hospitals." (Plaintiff's Ex. 448).

On March 15, 1989 the Association, through British counsel, wrote to WPA indicating its opposition to this "unauthorized" initiative and requesting that it be ceased within seven days of the date of the letter. This letter was also sent to Gamble at the D.C. Plan. No response was ever received by the Association from either party. (Plaintiff's Ex. 496).

Effective January 8, 1988, the D.C. Plan entered into a contract with the Kupat Holim Health Insurance Institution of Israel ("Kupat Holim"). (Defendant's Ex. 728;

Gamble at 725). Under the terms of the Agreement, the Kupat Holim hospitals would become members of the D.C. Plan's International Hospital Network.

On February 18, 1988, a Chicago newspaper contained an article announcing an agreement between Blue Cross/Blue Shield and two Israeli hospitals. No mention was made of the D.C. Plan in the article. (Plaintiff's Ex. 423).

On August 2, 1989, the Association, through local counsel in Tel Aviv, Israel, wrote to Kupat Holim requesting that they cease the unauthorized use of the Marks. (Plaintiff's Ex. 449). No response was received by the Association to this letter.

F. *Efforts By The Association To Protect The Marks Abroad*

The Association has filed 103 oppositions or cancellations in twenty-two countries to combat the D.C. Plan's secret registration program. The Association has obtained favorable rulings in four countries. (Plaintiff's Ex. 330).

The Association formed the International Service Mark Task Force ("Task Force") in April of 1987 to develop a comprehensive program to facilitate the use of the Marks abroad as well as to protect the Marks for all Plans. In June 1987, Tresnowsky sent a letter to all Plan CEO's regarding the development of a procedure which will provide protection of "our names and Marks if and when they are used in foreign countries." (Plaintiff's Ex. 20; Tr. 226–27).

The Task Force sent Gamble three direct invitations, including a request to fill out a Plan Survey, soliciting his input as to foreign registration efforts. (Plaintiff's Ex. 22, 24, 26.) Gamble did not participate in or respond to these inquiries. (Tr. 234–36).

To provide prompt protection, the Task Force began implementing a program involving the issuance of interim foreign licenses. This would provide non-exclusive foreign licenses to interested Plans for a set period of time, pending the issuance of permanent licenses. (Tr. 236–37).

On December 9, 1988, Roger G. Wilson, General Counsel of the Association ("Wilson"), sent a letter to Gamble soliciting his views on the proposed interim licensing program. (Plaintiff's Ex. 560).

On December 28, 1989, Wilson sent an application to all Plan CEO's for an interim foreign license. The letter accompanying the application provided:

> If your Plan is using the service marks to operate in any way in foreign countries and if it has developed plans or proposals to commence operations overseas using the service marks, the attached application for an interim license should be completed and returned by February 1, 1989.

(Plaintiff's Ex. 28).

The D.C. Plan never applied for any interim foreign licenses. Indeed, the D.C. Plan not only continued to file—in its own name—registrations for ownership of the Marks abroad, it also continued to oppose any foreign registration efforts by the Association. (Tr. 239).

Several of the Plans applied for interim foreign licenses. For example, as of December 28, 1988, the Delaware, South Carolina and Arizona Plans filed applications for interim foreign license agreements. (Plaintiff's Ex. 27, 337, 563, 341). The three Plans applied for, and were granted, licenses in eighty-one countries. (Plaintiff's Exh. 29, 338, 564).

## G. *Attempts At Reconciliation*

On January 20, 1989, Tresnowsky and Gamble discussed the issue of foreign registrations, and Gamble requested the opportunity to appear before the Board of Directors of the Association ("the Board"). (Tr. at 250; Gamble at 1201–02).

On March 30, 1989, Gamble presented to the Board his position as to ownership of the Marks abroad. The Board did not agree with Gamble's position. In fact, the Board conditioned the D.C. Plan's continued status as a Member Plan on submitting foreign ownership disputes to mediation. Ultimately, mediation was invoked, but it proved unsuccessful. (Tr. 250–53; Plaintiff's Ex. 477).

## II. *Jurisdiction*

The D.C. Plan has challenged this court's jurisdiction to decide this case. Plaintiff's (the Association's) Complaint has sought declaratory relief pursuant to Count I and injunctive relief under Count II, pursuant to the Lanham Act. In Count I, the Association has claimed that the D.C. Plan has breached its agreements concerning the Blue Cross and Blue Shield Marks. The D.C. Plan, in entering the licensing and ownership agreements, acknowledged that the Association is the owner of the Marks and that use of the Marks inures to the Association's benefit. Also pursuant to these agreements, the D.C. Plan recognized that it has the right to use the Marks only in the Metropolitan D.C. area.

The first question for the court concerns the interpretation of the licensing and ownership agreements. Specifically, the crucial question is the scope of these agreements. The D.C. Plan argues that the agreements only create U.S. rights for the Association and are silent as to foreign use. Thus, the D.C. Plan contends it has the right to use the Marks overseas and will be granted such rights on a country by country basis. Based on the alleged non-extraterritorial scope of the agreements, the D.C. Plan argues that this court lacks jurisdiction to enjoin it from using the Marks overseas.

U.S. courts have interpreted and enforced contracts between American citizens which involve property and actions in foreign countries. The Supreme Court has stated:

> Where the necessary parties are before a court of equity, it is immaterial that the res of the controversy, whether it be real or personal property, is beyond the territorial jurisdiction of the tribunal. It has the power to compel the defendant to do all things necessary ... which he could do voluntarily, to give full effect to the decree against him.

*Phelps v. McDonald,* 99 U.S. 298, 308, 25 L.Ed. 473 (1879); *see also, Nordson Corp. v. Plasschaert,* 674 F.2d 1371, 1377 (11th Cir.1982).

■ Further, a U.S. court has the ability to order an individual over whom it has personal jurisdiction to do an act, or refrain from doing an act, abroad; and such an order does not involve a *per se* invasion of the sovereignty of the foreign country. For example, in *United States v. Ross*, 302 F.2d 831 (2nd Cir.1962), the Court affirmed the district court's order requiring a U.S. citizen to turn over stock certificates. The defendant was to comply with the court's order regardless of whether the property was located within or without the limits of the court's territorial jurisdiction. The Court further held, "The action of the district court awarding appellant over whom it has jurisdiction to do an act in a foreign country does not *per se* involve any invasion of the sovereignty of that country." *Ross*, 302 F.2d at 834; *see also, Columbia Nastri & Carte Carbone, S/P/A v. Columbia Ribbon & Carbon Mfg. Co.*, 147 U.S.P.Q. 204 (S.D.N.Y.1965), *aff'd*, 367 F.2d 308 (2d Cir.1966).

In *Velsicol Chemical Corp. v. Hooker Chemical Corp.*, 230 F.Supp. 998 (N.D.Ill. 1964), the court confronted the question of whether declaratory relief was appropriate in resolving a dispute between a patent licensor and a licensee alleged to have violated a patent licensing agreement through unauthorized foreign activities. The court stated:

> [D]efendant apparently considers that plaintiff is seeking a determination by this court that defendant has infringed certain of plaintiff's foreign patents. The question, however, is not one of infringement, but rather is whether or not defendant retained a license to sell under [plaintiff's] foreign ... patents by virtue of [a provision] of the contract. This question, it seems to me, is precisely the kind of issue that the Declaratory Judgment Act was designed to resolve.

*Velsicol*, 230 F.Supp. at 1016–17. Thus the court in *Velsicol* found that it had jurisdiction to decide the dispute—despite the fact that the exercise of the court's jurisdiction would have an extraterritorial effect.

Therefore, as to Count I of plaintiff's complaint seeking declaratory relief, the court finds that it has jurisdiction to decide whether defendant D.C. Plan has breached the licensing agreement.[3]

■ The jurisdictional inquiry now turns to whether the court has jurisdiction to decide whether defendant D.C. Plan has violated the Lanham Trademark Act, 15 U.S.C. § 1114(1). In the seminal case of *Steele v. Bulova Watch Co.*, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952), the Supreme Court stated that the Lanham Act "confers broad jurisdictional powers upon courts of the United States.... The district courts of the United States are granted jurisdiction over all actions 'arising under' the Act, § 39, 15 U.S.C. § 1121, 15 U.S.C.A. § 1121, and can award relief which may include injunctions, 'according to the principles of equity,' to prevent the violation of any registrant's rights." *Steele*, 344 U.S. at 283–284, 73 S.Ct. at 254–55. (statutory citations omitted).

Generally, in determining whether extraterritorial jurisdiction should be exercised, a multi-step analysis has been devised. In the case of *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287 (3d Cir.1979), the Court enunciated the factors to be considered:

1. Degree of conflict with foreign law or policy;

2. Nationality of the parties;

3. Relative importance of the alleged violation of conduct here compared to that abroad;

4. Availability of a remedy abroad and the pendency of litigation there;

5. Existence of intent to harm or affect American commerce and its foreseeability;

6. Possible effect upon foreign relations if the court exercises jurisdiction and grants relief.

7. If relief is granted, whether a party will be placed in the position of being forced to perform an act illegal in either country or be under con-

---

**3.** It is interesting to note that defendant D.C. Plan, in its counterclaim, also seeks declaratory relief and that such relief, if granted, would have an extraterritorial effect.

flicting requirements by both countries;

8. Whether the court can make its order effective;

9. Whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances; and

10. Whether a treaty with the affected nations has addressed the issue.

*Mannington Mills,* 595 F.2d at 1297, 1298.

Turning to the first factor—conflict with foreign law or policy—the D.C. Plan has not demonstrated that the exercise of extraterritorial jurisdiction will conflict with foreign law. Indeed, the D.C. Plan's own expert witness in the field of foreign trademark law, Jeremiah McAuliffe, testified at trial that he "assumed that there would not be" any conflict with foreign law if the court exercises extraterritorial jurisdiction in this case. (Tr. 966–67).

As to the nationality of the parties, both the Association and the D.C. Plan are U.S. corporations with their principal places of business in Chicago, Illinois and Washington, D.C. respectively.

Regarding the extent to which enforcement can achieve compliance, the D.C. Plan and its employees are American citizens and thus subject to personal jurisdiction.

As to the relative importance of the alleged violation of conduct here compared to that abroad, declaratory and injunctive relief would prevent confusion over the Marks abroad as well as in the U.S.

Concerning the D.C. Plan's intent to affect U.S. commerce, the D.C. Plan has admitted that it intends to provide foreign subscribers visiting the U.S. with the ability to present Blue Cross and Blue Shield identification cards to hospitals with which the D.C. Plan has no contact.

No treaty between the U.S. and the affected nations addresses these issues.

Finally, the D.C. Plan's expert, Mr. McAuliff, testified that a U.S. court would have jurisdiction to prevent an unfair trade practice by a U.S. company in foreign commerce which causes confusion in the U.S.—even if some of the acts were done outside the U.S. (Tr. 964).

Accordingly, the court concludes that it has jurisdiction to decide the issues raised in the Complaint.

### III. *Ownership of the Marks* [4]

■ The agreements confer ownership of the Marks on the Association.

In 1952, the Association's predecessor acquired all the rights in the Blue Shield Marks pursuant to the Blue Shield Agreement to which the D.C. Plan was a party. (Plaintiff's Ex. 2).

In 1954, all of the Blue Cross Plans—including the D.C. Plan—assigned all of their rights in the Blue Cross Marks to the American Hospital Association. (Plaintiff's Ex. 3).

The Blue Cross Plans vested exclusive ownership and control of the Blue Cross Marks in the American Hospital Association. The 1954 Agreement provided, in pertinent part:

American [Hospital Association] shall hold and exercise *any and all rights of ownership* in and to the words Blue Cross and/or a design of a blue cross, as service marks, whether or not derived from this agreement, exclusively for prepayment plans for hospitals care and related services....

(Plaintiff's Ex. 3) (emphasis added).

Further, the 1954 Agreement provided that

Any and all applications for the registration of the words Blue Cross and/or a

---

**4.** Pursuant to Virginia choice of law rules, the validity, interpretation and construction of agreements are governed by the laws of the state where the contracts were made. *Crosson v. Conlee,* 745 F.2d 896, 902 (4th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 822 (1985). A contract is "made" where the final act necessary to make the contract binding is done. *See Chesapeake Supply & Equipment*

*Co. v. J.I. Case Co.,* 700 F.Supp. 1415, 1417 (E.D.Va.1988). All of the agreements in this case ultimately became effective by vote of the Association's Board of Directors in Illinois. Thus, because the agreements were made in Illinois, Virginia choice of law rules require that Illinois law governs the validity, interpretation and construction of the agreements.

design of a blue cross, as service marks and trade-marks, and any registrations granted *or to be granted hereafter* for said service marks and trade-marks, shall be solely in the name of American [Hospital Association] for the life of this agreement.

(*Id.*) (emphasis added).

The 1954 Agreement established that "the words Blue Cross and the design of a Blue Cross are known and recognized ... in foreign countries." (*Id.*)

The foregoing language substantiates that the American Hospital Association was vested with world-wide ownership in the Blue Cross Marks.

On June 30, 1972, the American Hospital Association transferred ownership of the Blue Cross Marks to the Blue Cross Association. The Member Plans consented to and entered into agreements regarding ownership of the Marks. In the 1972 Blue Cross Ownership Agreement (Plaintiff's Ex. 4), the American Hospital Association assigned to the Blue Cross Association all of its rights, both foreign and domestic, in the Marks. In the Ownership Agreement, the Member Plans—including the D.C. Plans' predecessor—consented to the assignment. (Plaintiff's Ex. 4).

The Plans also explicitly affirmed the assignment of rights made in the 1954 Blue Cross Agreement. (*Id.*)

The Blue Cross License Agreement, executed along with the 1972 Blue Cross Ownership Agreement, confirms that the Association is the owner of the term "Blue Cross" and the design of a blue cross as service marks for prepayment plans for hospital care and related services. (Plaintiff's Ex. 1).

In return for the grant of a license to use the Marks in the D.C. area, the D.C. Plan promised it would not "during the term of the License Agreement, attack the title of the Blue Cross Association in and to the License Marks or Licensed Name or attack the validity of this license." (Plaintiff's Ex. 1).

The D.C. Plan also agreed that "all use by it of the Licensed Marks and Licensed Name hereunder shall inure to the benefit of BCA [predecessor to the Association]." (*Id.*). The D.C. Plan further agreed that "[r]ights in the Licensed Marks and Licensed Name other than those specifically granted herein are reserved by BCA for its own use." (*Id.*)

In addition to the language of the ownership and licensing agreements, for over thirty years the conduct of the D.C. Plan has indicated its recognition that the Association owns the Marks. For example, since 1960 the D.C. Plan has contracted with the Association to underwrite and administer the federal employees program to approximately 12,000 Americans living abroad. (Plaintiff's Ex. 17). In 1983, the D.C. Plan formed World Access, Inc. ("World Access"), a travel-assistance program which provides U.S. travelers abroad with access to English-speaking doctors and makes hospital arrangements. The D.C. Plan distributes identification cards in conjunction with World Access, but these cards do not carry the Blue Cross and Blue Shield Marks nor has World Access ever promoted itself or its products as being affiliated in any way with the Blue Cross and Blue Shield Association.

In 1985, as an adjunct to World Access, the D.C. Plan developed an international hospital network consisting of a group of foreign hospitals which agreed to treat subscribers of World Access, the Federal Employees Program, and U.S. Member Plans. Materials sent by the D.C. Plan to hospitals within this network expressly acknowledged that the Association owned the Marks via a legend on these materials indicating the Association as owner of the Marks. (Plaintiff's Ex. 609).

There have also been instances where unauthorized use of the Marks by the D.C. Plan has been discovered by the Association and quickly rectified by the D.C. Plan. For example, in 1985 a D.C. Plan subsidiary, Access America, complied with the Association's request to cease using the Marks in connection with its foreign travel services. (Plaintiff's Ex. 282; Defendant's Ex. 1259).

All other Member Plans have interpreted the Association's ownership rights under the agreements as extending to foreign countries. *See American National Bank & Trust Co. v. Lambessis,* 116 Ill.App.2d 5, 253 N.E.2d 126, 130 (1st Dist. Ill.1969) ("where all parties adopt and act on a certain construction of a contract, there is no better extrinsic evidence of their intention"). Further, no other Member Plan has challenged the Association's ownership of the Marks—in the United States or abroad.

In preparing to challenge the Association's foreign ownership of the Marks, the D.C. Plan devised a strategy for initiating foreign registration. This was a clandestine strategy, planned and executed without the knowledge of the Association or any of the Member Plans. Particularly egregious is the memorandum from Groppe to Gamble of August 4, 1986 (Plaintiff's Ex. 35) wherein Groppe discusses foreign registrations and how to approach the Association. Groppe's plan provided that:

1. Before GHMSI can secure all the trademark registrations we want worldwide, BCBSA will discovery our activity.

2. This discovery is likely to come through the Kilmer [law] firm when it starts to do title searches and discovers our activities.

3. We expect this discovery to take place in the next 3 to 9 months....

The best case scenario is that we are able to negotiate an arrangement with BCBSA directly to use the name and mark exclusively in those countries in which we want to do business. The worst case scenario is that BCBSA moves to try to limit, restrict or remove our ability to do business and use the name and trademark internationally. It is clear in its worst case scenario that BCBSA has enough clout to make life difficult for us on the domestic side even if we were to successfully defend against their restricting our use of trademark overseas.

(Plaintiff's Ex. 35).

Obviously, the D.C. Plan was attempting a surreptitious end-run around the Agreements. The D.C. Plan was attempting to gain leverage on the Association by registering the Marks in foreign countries before the Association discovered its activities. These activities were a clear violation of the Agreements.

Accordingly, the court concludes that the D.C. Plan has breached its License Agreement by registering the Marks in foreign countries in its own name for its exclusive benefit. *See B.V.D. Licensing Corp. v. Maro Hosiery Corp.,* 688 F.Supp. 961, 962–64 (S.D.N.Y.1988).

## IV. *The Lanham Act*

The Lanham Act, 15 U.S.C. § 1114(1), provides, in pertinent part, that

Any person who shall, without consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant ...

The Fourth Circuit in *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984), set forth a number of factors to be considered in determining the likelihood of confusion:

1. the strength or distinctiveness of the marks;

2. the similarity of the marks;

3. the similarity of the goods/services the marks identify;

4. the similarity of the facilities the two parties use in their business;

5. the similarity of the advertising used by the parties;

6. the defendant's intent; and

7. actual confusion.

It is without peradventure that the Blue Cross and Blue Shield Marks are distinctive. The Blue Cross and Blue Shield Marks are strong Marks within the U.S. *See Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Association,* 711 F.Supp. 1423, 1433 (S.D. Ohio 1989); *Blue Cross and Blue Shield Association*

v. *Blue Cross Mutual Clinic, Inc.*, 612 F.Supp. 41, 44 (S.D.Fla.1985); *National Association of Blue Shield Plans v. Lovelace*, 435 F.Supp. 115, 117 (N.D.Cal.1977).

The Marks are used abroad in targeted countries where the Blue Cross and Blue Shield name and symbols have immediate recognition among major foreign insurance companies.

The Marks used by the D.C. Plan are identical to those used by the Association. The manner of the D.C. Plan's use of the Marks in foreign promotional materials demonstrates its intention to mislead its foreign joint venture partners into believing that they are receiving the benefits of the Blue Cross and Blue Shield Marks in the United States. For example, the D.C. Plan distributed brochures in Latin America which indicated that the Blue Cross and Blue Shield cards help foreign subscribers gain access to several thousand U.S. hospitals when traveling to the United States— although such access was never authorized by the Association or any of the Member Plans. (Plaintiff's Ex. 380). In addition, the D.C. Plan attempted to hide from Yasuda, its Japanese joint venture partner, the fact that Yasuda was dealing with the D.C. Plan and not the Association. (Plaintiff's Ex. 435). This effort at deception was apparently successful, for Yasuda was clearly confused, believing that it was dealing with the Blue Cross and Blue Shield Association and not merely one of its Plans. (Plaintiff's Ex. 436). It is beyond cavil that there has been actual confusion and such confusion was intentional. *See Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 648 (6th Cir.1982).

In addition, the sales and advertising methods used by the D.C. Plan in its foreign business efforts are similar to those used by the Association and other Plans.

Accordingly, the court finds that the D.C. Plan has violated the Lanham Act.

## V. *Affirmative Defenses and Counterclaims*

The D.C. Plan has raised an affirmative defense of laches and has brought a counterclaim alleging tortious interference with contractual and prospective business relations, as well as alleging a violation of the federal antitrust laws.

### A. Laches

■■■ The determination as to whether a claim is barred by laches is committed to the sound discretion of the trial court. *Murphy v. Holland*, 237 Va. 212, 377 S.E.2d 363, 365 (1989).[5] In order for laches to bar an action, there must be a delay accompanied by facts indicating an intention to abandon the claim, and the delay must be unreasonable and injurious to the party asserting the laches defense. *Murphy*, 377 S.E.2d at 365.

As to the Association's claim for declaratory relief, the court finds that any delay by the Association in bringing this action was not made with the intention to abandon any of its rights in the Marks. When first learning of the D.C. Plan's foreign initiatives, the Association was under the belief that these efforts were being done on behalf of the Association and all the Member Plans—not solely a unilateral move on the part of the D.C. Plan. Later, upon discovering that the D.C. Plan sought to gain foreign rights only for itself, the Association sought, through the establishment of the International Trade Mark Task Force, a means by which Member Plans could acquire licenses to establish business abroad. The D.C. Plan, however, declined to participate in this program. Finally, the Association invoked mediation proceedings to attempt to solve the impasse with the D.C. Plan. Clearly, any delay on the part of the Association was not done with the intention to abandon its rights in the Marks. Further, the D.C. Plan prompted some of the delay by devising its clandestine strategy to register the Marks abroad. (Plaintiff's Ex. 35). Based on these circum-

---

5. Federal courts hearing a state law claim must apply the procedural rules of the forum state, including its choice of law rules. *Zuckowski v. Dunton*, 650 F.2d 30, 34, n. 3 (4th Cir.1981).

Under Virginia law, questions regarding the timeliness of an action are determined by reference to forum law. *Hospelhorn v. Corbin*, 179 Va. 348, 19 S.E.2d 72 (1942).

stances, it cannot be said that any delay by the Association was unreasonable or injurious to the D.C. Plan.

█ In addition, the Association's claim for declaratory relief is not barred by the relevant statute of limitations. As previously indicated, the contract at issue in this case provides that Illinois law governs. The applicable Illinois statute provides a five year limitations period. Virginia Code Section 8.01–247 provides that:

No action shall be maintained on any contract which is governed by the law of another state or country if the right of action thereon is barred either by the laws of such state or country or of this commonwealth.

*See* Virginia Code Section 8.01–230; *Goodell v. Rehrig Int'l, Inc.*, 683 F.Supp. 1051, 1056 (E.D.Va.1988), *aff'd* 865 F.2d 1257 (4th Cir.1989).

Plaintiff's action was filed on July 7, 1989, and as indicated in the court's Findings of Fact, the Association was not aware of the D.C. Plan's foreign registration program in 1986. (Tr. 2101). The court finds Mr. Tresnowsky's testimony on this point to be believable. Further, Mr. Gamble testified that he told Marvin C. Reiter (Vice President and Deputy General Counsel of the Association) about the D.C. Plan's foreign registration efforts in November 1985. (Tr. 749–750). However, Reiter testified that he and Gamble only had a general discussion in which Gamble said the D.C. Plan was looking at overseas initiatives. As to this dispute of fact, the court credits Reiter's testimony. (Dep. of Reiter, p. 24). The court believes that Gamble mentioned overseas initiatives with Reiter but did not discuss specifics regarding registering the Marks overseas.

Therefore, as to plaintiff's action for declaratory relief as to the ownership of the Marks, the court finds this Count to have been timely brought.

█ A defense of laches to a claim for injunctive relief under the Lanham Act re-

quires "plaintiff's knowledge of defendant's use of the mark; plaintiff's inexcusable delay in taking action; and the prejudice that will accrue if plaintiff is allowed to assert its right at this time." *Perini Corp. v. Perini Construction, Inc.*, 715 F.Supp. 719, 723 (D.Md.1989). As indicated above, the true nature of the D.C. Plan's foreign registration strategy—that all foreign rights to the Marks would inure only to the D.C. Plan—was hidden from the Association. Also, once known, the Association initially believed that the D.C. Plan's foreign efforts were taken on behalf of the Association and all the Member Plans. Once the Association became aware of the reality of the situation, it sought to protect its rights in the Marks—first through the interim licensing mechanism, then through arbitration, and ultimately through the bringing of this action.

The Association has not inexcusably delayed in asserting its rights. As to any prejudice that will accrue to the D.C. Plan if the Association is allowed to assert its rights to the Marks at this time, "It is only ... where the delay is so prolonged and inexcusable that it amounts to a virtual abandonment of the right by the plaintiff for a long period of time that the balance of equities would favor the knowing infringer." *Perini*, 715 F.Supp. at 725 *quoting Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 614–15 (7th Cir.1965). In light of the fact that a portion of any delay was precipitated by the D.C. Plan's own covert strategy, the court does not find any prejudice to the D.C. Plan caused by the Association now asserting its rights in the Marks.

█ Also, because the D.C. Plan's conduct is continuing, the statute of limitations does not bar the Lanham Act claim. *See Valmor Products Co. v. Standard Products*, 464 F.2d 200, 204 (1st Cir.1972); *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 526 (10th Cir.1987); *James Burrough, Ltd. v. Sign of the Beefeater, Inc.*, 572 F.2d 574, 578 (7th Cir.1978).[6]

---

**6.** The D.C. Plan's counterclaim also includes a claim for selective enforcement, although this claim was not argued during the course of the

trial. In any event, the court finds that the D.C. Plan has failed to show selective enforcement. *See United States Jaycees v. Philadelphia Jaycees,*

Accordingly, plaintiff's complaint is not barred by laches or any statutes of limitations.

### B. Intentional Interference with Contractual Relations and Prospective Business Rights

■ Counts 2 and 3 of the D.C. Plan's Counterclaim seeks damages for intentional interference of contractual relationships, particularly those it has established with the WPA, Federal National De la Mutulite Francaise, (FNMF), Israel's Kupat Holim and with the Yasuda Fire and Marine Insurance Co. in Japan. The D.C. Plan contends that under the contracts with each of these parties extensive business dealings were contemplated for the future.

■ A federal court sitting in diversity is bound to apply the conflict of laws of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Pursuant to Virginia's conflict of laws rules, the rule of *lex loci delecti* is to be applied. In other words, the place of the wrong determines the right to recover. *See McMillian v. McMillian,* 219 Va. 1127, 253 S.E.2d 662 (1979). Here, the place of the alleged wrong is the District of Columbia, the D.C. Plan's principal place of business. Thus, as to the state law aspects of the counterclaim, D.C. law applies. Under D.C. law, the elements for intentional interference with third-party contracts are as follows: (1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of its breach by the defendant; and (4) damages resulting from the breach. *Tuxedo Contractors, Inc. v. Swindell–Dressler,* 613 F.2d 1159, 1162 (D.C.Cir. 1979). Further, "a party may lawfully engage in conduct which may interfere with a contract or contractual relations if it 'asserts in good faith a legally protected interest of his own or threatens in good faith to protect the interest ... if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.'" *In re Ashby Enterprises, Ltd.,* 47 B.R. 394, 397 (D.D.C. 1985) (*quoting* Restatement (Second) of Torts § 773).

In regard to the alleged intentional interference with FNMF, Tresnowski's December 29, 1988 letter to Renee Teulade, chairman of FNMF, was rather straight-forward. The letter informed Teulade that the Association owned the Marks, that the D.C. Plan was a licensee, and that the Association had undertaken legal action to keep the D.C. Plan from registering the Marks in its own name. Furthermore, Tresnowski indicated in his letter that the Association did not object to FNMF entering into the relationship with the D.C. Plan as long as it did not involve any use of the Marks. (Plaintiff's Ex. 47). FNMF proceeded with its arrangement with the D.C. Plan without using the Blue Cross and Blue Shield Marks. (Plaintiff's Ex. 493).

In March of 1989, the Association sent a letter to WPA indicating the likelihood of confusion that has and will obtain if the WPA continues to be party to the use of the Marks. The letter only requested that WPA cease using the Marks in conjunction with its arrangement with the D.C. Plan. (Plaintiff's Ex. 496).

In regards to Kupat Holim, the Association became aware of the Blue Cross and Blue Shield Marks appearing without authorization on the letterhead of Kupat Holim. (Plaintiff's Exh. 499). On August 2, the attorney for the Association, Roger Wilson wrote Kupat Holim concerning unauthorized use of the Blue Cross and Blue Shield Marks. The letter clearly indicated that the Association only objected to the unauthorized use of the Marks and not to the hospital engaging in business with the D.C. Plan.

It is significant that Kupat Holim has not terminated its arrangement with the D.C. Plan, but has informed the Association that it intends to continue its arrangement with the D.C. Plan, save for use of the Marks.

639 F.2d 134 (3d Cir.1981). In addition, D.C. Plan has failed to establish that the Association has waived any of its rights.

(Dep. of Gamble, p. 1150; Plaintiff's Ex. 1103).

By letter dated October 20, 1989, Roger Wilson, Association General Counsel of the Association, wrote to Yasuda regarding use of the Marks. His letter indicated that the D.C. Plan was not authorized to use the Marks in Japan. Wilson's letter made clear that the Association did not object to Yasuda entering into other business relationships with the D.C. Plan not involving the Marks. (Plaintiff's Ex. 500).

The letters sent by the Association have not procured the breach of any of the contracts the D.C. Plan has with any foreign entity. Indeed, these letters do not intimate any intentional interference but merely seek to protect rights the Association, in good faith, believes it has in the Marks.

■ With regard to the D.C. Plan's claim for interference with prospective business relations, this action applies only to expectancies which have not yet been reduced to contract. *Carr v. Brown*, 395 A.2d 79, 84 (D.C.App.1978). In this case, the D.C. Plan alleges interference with existing contracts. Thus, the interference with prospective business relations claim is without merit.

Accordingly, the D.C. Plan's counterclaim for intentional interference affecting contractual rights and prospective business relationships, Counts II and III of the Counterclaim, have not been proven and must be dismissed.

### VI. *Antitrust Claim*

■ In its Counterclaim, the D.C. Plan also alleges a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which provides, in pertinent part:

> Every contract, combination in the form of trust, or otherwise, or conspiracy, in restraint of trade of commerce among the several States, or with foreign nations, is declared to be illegal....

■ To establish a violation of Section 1 of the Sherman Act ("the Act"), the D.C. Plan must show: (1) the existence of a conspiracy or concerted action; (2) that the conspiracy resulted in adverse, anti-competitive effects within the relevant product and geographic market; (3) that the objects of and conduct pursuant to the conspiracy were illegal; and (4) that the party bringing the claim must have been injured as a result of the conspiracy. *Terry's Floor Fashions v. Burlington Industries, Inc.*, 763 F.2d 604, 610, n. 10 (4th Cir.1985). "Concerted action is the essence of a Section 1 claim." *Id.*

■ Applying these elements to the facts of this case, it is clear that the D.C. Plan's antitrust claim fails. First, the D.C. Plan has not established the penultimate requirement of a conspiracy or concerted action. Mr. Gamble's testimony failed to identify any alleged co-conspirators. *See Lombard's Inc. v. Prince Manufacturing, Inc.*, 753 F.2d 974, 975 (11th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 892 (1986) (failure of complaint to identify co-conspirators provides grounds for granting motion to dismiss). Mere speculation as to the existence of a conspiracy, without more, is not sufficient to establish a violation of Section 1 of the Act. *Terry's Floor Fashions*, 763 F.2d at 611. Further, it is well-settled that Section 1 of the Act "does not proscribe independent action" but only concerted action. *Terry's Floor Fashions*, 763 F.2d at 610; *see also, Monsanto Co. v. Spray–Rite Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

■■ The Association has a right to protect its Marks and not face the charge of antitrust violations. Good faith efforts to enforce trademark rights do not violate the Sherman Act. Indeed, vigorous enforcement of trademark rights is exactly the "sort of aggressive competition and promotion that antitrust law seeks to protect." *Drop Dead Co. v. S.C. Johnson & Son, Inc.*, 326 F.2d 87, 96 (9th Cir.1963), *cert. denied* 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964). Further, the *Noerr–Pennington Doctrine* confers absolute immunity on the Association for its actions.

The D.C. Plan has failed to show that the Association's actions unreasonably restrained trade. The D.C. Plan has also failed to show that the Association's ef-

forts in protecting its Marks have restrained competition in the relevant product or geographic market. *See Brunswick Corp. v. Peublo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Military Services Realty, Inc. v. Realty Consultants of Virginia,* 823 F.2d 829, 832 (4th Cir.1987).[7]

### VII. *Conclusions of Law*

(1) The court concludes as a matter of law that it has jurisdiction;

(2) Under the license and ownership agreements, as between the Association and the D.C. Plan, the Association is the owner of any and all rights in the Marks;

(3) Any use of the Marks by the D.C. Plan, including use in foreign countries, has inured and continues to inure to the benefit of the Association;

(4) All rights, if any, that may have been created by the D.C. Plan's use of the Marks in foreign countries are the property of the Association and are held in trust by the D.C. Plan for the Association;

(5) That the defendant has breached the Licensing Agreement with plaintiff by attempting to register and own the Marks, in its own name, in foreign countries;

(6) That the defendant has violated the Lanham Act;

(7) That the defendant has failed to prove its claim of laches;

(8) That the defendant has failed to prove its claim for tortious interference with contractual rights and prospective business relations; and

(9) That the defendant has failed to prove its claim for violation of the Sherman Antitrust Act.

Accordingly, an appropriate Order shall issue.

### ORDER

In accordance with the accompanying Memorandum Opinion, it is accordingly ORDERED:

(1) that Judgment be, and it hereby is, ENTERED in favor of the plaintiff and against the defendant upon plaintiff's Complaint, Count I, Breach of Contract and Count II, Violation of the Lanham Act;

(2) that Judgment be, and it hereby is, ENTERED in favor of the plaintiff/counter-defendant and against the defendant and counter-plaintiff on the Counterclaim brought by the defendant and counter-plaintiff. The Counterclaim is DISMISSED with prejudice;

(3) that the defendant and its officers, agents, and employees and those persons in active concert or participation with them who receive notice of this Order are hereby ENJOINED and RESTRAINED from:

a. breaching the Blue Cross and Blue Shield License and Ownership Agreements;

b. taking any further action to register the Marks in the name of the D.C. Plan in foreign countries or to cancel or depose any registration of the Marks by the Association in foreign countries;

c. claiming ownership of the Marks or challenging the Association's ownership of or title of the Marks in any foreign countries;

d. using the Marks in connection with the sales promotion of health care financing services or any other product service in foreign countries without license or authorization from the Association;

---

**7.** The D.C. Plan relies heavily on *U.S. v. Sealy,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). *Sealy* involved an antitrust action brought by the government against a licensor of mattresses and bedding products. The complained of conduct consisted of the licensor conspiring with its licensees to allocate mutually-exclusive territories among the licensees. The licensor essentially promised the licensees not to grant any additional licenses to others seeking to operate in the same geographic area as the licensees. The facts of *Sealy* are clearly distinguishable to those in this case. The anti-competitive conduct in *Sealy* affected those who sought to sell Sealy products in an area already granted to a designated licensee. The arrangement between Sealy and its licensees completely foreclosed others from selling Sealy products in a particular area. In this case, the Association, in seeking to protect its rights in the Marks, has not completely foreclosed the D.C. Plan from engaging in foreign business. The Association has indeed encouraged such business, provided that the Marks are not used without its consent and authorization.

(3) that the defendant is ORDERED to assign to the plaintiff all registration, applications, petitions and any other rights defendant may have or claim of the Marks in foreign countries, and dismiss any opposition, petitions or cancellations, or any other actions currently pending against the Association in foreign countries, or challenging plaintiff's ownership of the Marks in those countries;

(4) that the defendant is ORDERED to notify its foreign joint venture partners, foreign subscribers and the foreign hospitals with which it has agreements, that as between the plaintiff and defendant, the plaintiff is the owner of the Marks and any registrations and applications therefore;

(5) that the defendant, its officers, agents, employees and those persons in active concert or participation with them will receive notice of this Order hereby enjoining and restraining from:

a. using the Marks on material distributed in foreign countries without the express authorization of the Association;

b. distributing material not authorized by the Association, which bears the Marks in foreign countries with the intent, instructions, advice or understanding that said material may be brought into the United States;

c. using the Marks in connection with the sale of health care financial products and services or other products, where such use is likely to create the impression that:

(1) the defendant is the plaintiff or the Blue Cross and Blue Shield System;

(2) the defendant or its foreign partners are authorized or approved by the plaintiff or the Blue Cross and Blue Shield System to sell Blue Cross and Blue Shield insurance in foreign countries; or

(3) the defendant can make available to foreign subscribers the benefits of the Blue Cross and Blue Shield System in the U.S., when such representations have not been authorized by the Association;

(6) that within fifteen (15) days of this Order, defendant shall provide a copy of the Order to each of defendant's officers, employees, brokers, and joint venture partners who are engaged in the sale or promotion of its products and services in foreign countries using the Marks. Accompanying the Order shall be a cover letter: (a) explaining that the defendant does not sell insurance in foreign countries that has been sponsored or approved by the Association or the Blue Cross and Blue Shield System; and (b) recalling all material which violates paragraph 5 above. Defendant shall collect all such material and shall deliver them to the U.S. Marshal for destruction. Copies of these letters shall be submitted to the court and counsel for the Association;

(7) that within thirty (30) days of this Order, the defendant shall mail a letter to each person who has purchased an insurance product from the defendant or its joint venture partners, which letter shall advise the recipients that the defendant does not sell insurance in foreign counties that has not been sponsored or approved by the Association or the Blue Cross and Blue Shield System and that cards with the Marks on them may not be presented to, or accepted by, accepted hospitals in the United States for prepaid services. Copies of these letters shall be submitted to the court and counsel for the Association;

(8) that within fifteen (15) days of this Order, the plaintiff shall FILE its brief in support of its Petition for Attorney's Fees, and within thirty (30) days of this Order, the defendant shall file an Opposition to plaintiff's request for attorney's fees. Should the court grant plaintiff's request for attorney's fees, the court will then place parties on a briefing schedule as to the reasonableness of fees requested;

(9) that the court retains jurisdiction of this action for the purpose of granting any further and necessary relief.